PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 09-3093

_____

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,
Appellant

v.

THE GEO GROUP, INC.

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-07-cv-04043)
District Judge: Honorable John P. Fullam

_____

Argued February 11, 2010

Before: SLOVITER, ROTH, and TASHIMA,[*] Circuit Judges

(Filed : August 2, 2010)

_____

Dawn M. Edge
Iris A. Santiago-Flores
Equal Employment Opportunity Commission
Philadelphia, PA 19106

_____

[*]Honorable A. Wallace Tashima, Senior Judge of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

James L. Lee
Carolyn L. Wheeler
Lorraine C. Davis
Elizabeth E. Theran  (Argued)
Equal Employment Opportunity Commission
Washington, D.C.  20507

     Attorneys for Appellant

John P. Gonzales
Joseph J. Santarone, Jr.
Marshall, Dennehey, Warner, Coleman & Goggin
King of Prussia, PA l9406

Walter F. Kawalec, III  (Argued)
Marshall, Dennehey, Warner, Coleman & Goggin
Cherry Hill, N.J.  08002

     Attorneys for Appellee

_____

OPINION OF THE COURT

_____

SLOVITER, *Circuit Judge*.

## I.

The Equal Employment Opportunity Commission ("EEOC") appeals from the decision of the District Court granting the summary judgment motion of defendant, the GEO Group, Inc. ("GEO").  GEO is a private company that was contracted to run the George W. Hill Correctional Facility (the "Hill Facility"), which is the prison for Delaware County, Pennsylvania.  The EEOC filed its complaint pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.*, on behalf of a class of Muslim women employees, alleging that GEO violated Title VII's prohibitions on religious discrimination when it failed to accommodate the class members by providing them an exception to the prison's dress policy that

2

otherwise precluded them from wearing Muslim head coverings called khimars at work. GEO moved for summary judgment, arguing in part that a deviation from its policy would cause it an undue hardship by compromising its institutional interests in security and safety. Although the EEOC had filed a cross motion for summary judgment, on appeal it argues that the District Court erred because questions of material fact exist about whether accommodating the class would in fact constitute an undue hardship for GEO.

GEO is a private, international corporation that, among other related things, runs federal and state prisons in the United States. The Hill Facility in Thornton, Pennsylvania holds "pre-trial detainees and persons serving a county sentence of two years less one day or a state sentence of five years less one day." Appellant's Brief at 3 (quotation omitted). During the relevant period Raymond Nardolillo was the warden at the Hill Facility and Matthew Holm, who was hired in August 2004, was the deputy warden. In about February 2008, Holm became warden of the Hill Facility.

In April 2005, the Hill Facility instituted a dress policy that provided that "[n]o hats or caps will be permitted to be worn in the facility unless issued with the uniform." App. at 207. The new policy also stated that "[s]carves and hooded jackets or sweatshirts will not be permitted past the Front Security Desk." App. at 207. These directives were interpreted to prohibit the wearing of a khimar, an "Islamic religious head scarf, designed to cover the hair, forehead, sides of the neck, shoulders, and chest,"[1] which was until then worn by some female Muslim employees inside of the Hill Facility. App. at 15.

To reinforce the April 2005 prohibitions on hats, head

_____

[1]Although there appear to be many different styles of khimars, neither party has attempted to describe the khimars at issue here with any particularity. The quoted definition is from the complaint, and we will accept it as an accurate description that applies to the khimars worn by the class members.

scarves and hoods, Holm issued a memorandum on October 24, 2005, entitled "UNIFORM POLICY," that stated:

> Reminder! All employees, while on duty, will if required, wear only an official GEO uniform, which adheres to the dress code and standards, described in Policy 300.19. This includes, but [is] not limited to the length of your hair, scarves, hooded jackets, sweatshirts and specifically hats. The following are excerpts form [sic] the policy:
> "No hats or caps will be permitted to be worn in the facility unless issued with the uniform."
> "The Uniform described below is not to be altered, modified, or embellished upon. Only items approved by the Warden will be authorized."
> Those employees not subjected to the uniform policy will adhere to the Facility dress code, which is posted at the Front Entrance Security Post/ION Scan.
> This means that all hats, caps or religious attire will not be permitted to be worn with your uniform or by non-uniformed employees unless specifically authorized by the Warden. At this time there are no authorized hats, caps or attire, which can be worn inside the jail and there are no exceptions to this policy.

App. at 215.

After the October 2005 memorandum was issued, Holm and Nardolillo adopted and enforced a "zero tolerance headgear policy. . . ." Appellant's Br. at 6. According to GEO, the no-headgear policy was adopted for safety and security reasons to prevent the introduction of contraband into the prison facility and to avoid misidentification.

Three Muslim women employees of the Hill Facility, Carmen Sharpe-Allen, Marquita King, and Rashemma Moss, protested, claiming that wearing of the khimar was required by the Islamic religion. They sought an exception to the policy, arguing that before the April 2005 dress code, they had all been wearing some style of khimar or head covering at work. After

4

the April 2005 dress code was instituted, they were all prevented from doing so.

Sharpe-Allen was hired as a medication nurse at the Hill Facility in 2004. During her interview for that position she explained that her faith required her to wear a khimar, and that she "wasn't willing to compromise" concerning the wearing of her khimar at work. App. at 43. According to Sharpe-Allen, the interviewer told her that "[h]e didn't see it being a problem." App. at 44. Part of Sharpe-Allen's initial job at the Hill Facility was to "go from cell block to cell block" to "dispense medication" accompanied by a prison "officer." App. at 45.

In early 2005, Sharpe-Allen became the chronic infectious disease nurse, a position in which she worked "closely with the doctor" in the infirmary "with the inmates who had infectious diseases, such as hepatitis, [and] HIV . . . [to] ma[k]e sure that they got their medication, [and] made sure it was ordered . . . . [and in which she] did all of the PPDs, which is the tuberculosis test, for the entire prison." App. at 49. "From November 2004 through mid-July 2005, when Sharpe-Allen went out on medical leave, she wore her khimar to work daily at" the Hill Facility. Appellant's Br. at 8. When Sharpe-Allen was preparing to return to work from that medical leave, colleagues called to tell her that she could not "wear [her] khimar when [she] c[a]me back to work." App. at 52. Sharpe-Allen then spoke with someone in human resources at the Hill Facility who told her that "the khimar would be an issue." App. at 54. As a result, Sharpe-Allen asked to speak with Warden Nardolillo.

According to Sharpe-Allen, when she and Nardolillo spoke,[2] the warden told her that the policy would be enforced

---

[2] Sharpe-Allen testified that she had two meetings with the warden, but she could not remember exactly what transpired at either of them. According to Sharpe-Allen's testimony, Nardolillo took the consistent position at both meetings that she would not receive an exception to the no khimar rule.

against her but asked if she would be willing to "wear a headpiece [or] hairpiece . . . ." App. at 58. He also told Sharpe-Allen that her "job was there, if [she] wanted it, [she] just couldn't wear [her] khimar," but that if she refused to work without the khimar or resign, the prison would have to fire her. App. at 59. Sharpe-Allen told Nardolillo that she enjoyed her job and that the khimar had never presented any problem in the past, but also that she would not compromise about wearing the khimar to work. In December 2005, Allen was fired on the ground that "she had 'effectively abandoned her job' by 'refus[ing] to comply with [the] directive to return to work without the wearing of her'" khimar. Appellant's Br. at 10 (quoting App. at 216-17).

Marquita King is a Muslim woman who was hired at the Hill Facility in July 2000 as an "intake specialist" at the prison: the person who does the paperwork to process new prisoners into the facility. King's job entailed such duties as performing a "bench warrant check" on new prisoners. App. at 129. She would also have corrections officers bring individual prisoners to her so that she could ask them questions and input their answers into a computer. Unlike the corrections officers, she had no keys to the facility. At her interview for the job, King wore her khimar and a veil. The interviewer asked King if she would take her veil off at work, and King agreed that would be acceptable. There was no discussion of King's khimar at the interview, and she wore it to work for the first five years of her employment.

In October 2005, King was told by a fellow employee that she and other Muslim women were no longer allowed to wear their khimars at work. King then called warden Nardolillo who, according to King, told her that she "will be fired if [she] ha[s] a khimar on [her] head" at work. App. at 131. Stressed by this new situation, King took leave for the next four to six weeks. When she returned, King took off her khimar at work.

Rashemma Moss began working as a correctional officer at the Hill Facility in March 2002, a job which sometimes required her to be close to inmates and sometimes even to come

into physical contact with them. In July 2005, after Moss took her Shahada – "the Muslim confession of faith," Appellant's Br. at 6 n.2 – at work she began to wear underneath her hat a triangle shaped underscarf that she would tie around her head. In a meeting in October 2005, Nardolillo told Moss that she could no longer wear her head scarf, and that she would be suspended without pay if she did. Thereafter, Moss stopped wearing her head scarf to work.

In September 2007, the EEOC as plaintiff, with Sharpe-Allen as the charging party, filed a complaint alleging that GEO violated Title VII's prohibitions on religious discrimination when GEO failed to accommodate the religious beliefs of Sharpe-Allen and other female Muslim GEO employees by refusing their requests for an exception to the Hill Facility's dress policy that would have allowed them to wear khimars at work.

GEO moved for summary judgment, in part asserting the affirmative defense that it would be an undue hardship as a matter of law for the prison to allow its Muslim employees a complete exception to the non-headgear policy because such an accommodation would compromise the prison's interest in safety and security and/or would result in more than de minimis cost. The EEOC opposed that motion on the ground that these interests were insufficiently founded, relying heavily on the report of its expert, George Camp (the "Camp Report"), which generally concluded that: "(1) GEO's professed reasons for denying any of its female employees the ability to wear a khimar lack merit and substance; (2) GEO made no genuine attempt to, nor reasonable offer of, an alternative method (of which several exist) for accommodating the wearing of the khimar; and (3) [t]here is no sound legitimate correctional reason for GEO to deny its female employees to wear a khimar within the secure perimeter of the facility." App. at 219.

The District Court granted GEO's motion, finding dispositive this court's reasoning in *Webb v. City of Phila.*, 562 F.3d 256, 258 (3d Cir. 2009). In *Webb* this court held that the dress code adopted by the Philadelphia police, which did not

7

"authorize[] the wearing of religious symbols or garb as part of the uniform" and therefore precluded Muslim women from wearing khimars on the job, was not a violation of Title VII. *Id.* In granting GEO's motion for summary judgment, the District Court concluded that there was "no meaningful distinction between prison guards and similar personnel, on the one hand, and police officers," who were at issue in *Webb*. *EEOC v. GEO Group, Inc.*, No. 07-cv-04043-JF, 2009 WL 1382914, at *1 (E.D. Pa. May 18, 2009). The Court also stated that the "same considerations advanced to justify the regulation in question apply equally to prison guards and employees working in the medical department." *Id.*

## II.

Our review of the District Court's grant of summary judgment is plenary. *Jackson v. Danberg*, 594 F.3d 210, 215 (3d Cir. 2010). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[3]

Title VII of the Civil Rights Act of 1964 reads, in relevant part:

(a) It shall be an unlawful employment practice for an employer -

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion . . .; or

(2) to limit, segregate or classify his employees or

---

[3] The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291.

applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . religion . . . .

42 U.S.C. § 2000e-2(a). "Religion" is defined to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." *Id.* § 2000e(j).

This court has recently stated: "To establish a prima facie case of religious discrimination, the employee must show: (1) she holds a sincere religious belief that conflicts with a job requirement; (2) she informed her employer of the conflict; and (3) she was disciplined for failing to comply with the conflicting requirement." *Webb*, 562 F.3d at 259. "[T]he burden [then] shifts to the employer to show either [1] it made a good-faith effort to reasonably accommodate the religious belief, or [2] such an accommodation would work an undue hardship upon the employer and its business." *Id*. (citation omitted).

GEO does not argue that the EEOC failed to present a prima facie case. Instead, GEO argues that it offered plaintiffs "a reasonable accommodation, by offering to permit the Muslim women employees to wear a hairpiece in place of the khimar" because "it fulfills the stated religious requirement that the hair be covered." Appellee's Br. at 13-14; *see Ansonia Bd. of Educ. v. Philbrook,* 479 U.S. 60, 68 (1986) (noting that there is "no basis in either the statute or its legislative history for requiring an employer to choose any particular reasonable accommodation."). GEO notes that one female Muslim employee found that a hairpiece was sufficient to fulfill the religious requirement to cover her hair. We are not persuaded by this argument. There is no evidence about the proposed hairpiece nor any details about the Muslim employee who found it acceptable. We are unwilling to delve into any matters of theology, and will therefore decline GEO's invitation to decide on our own what might constitute a reasonable substitute for a khimar under the

Islamic faith. GEO does not challenge the assertion of the three Muslim employees that they believe wearing the khimar is integral to their religion, and we proceed on the basis that this is their sincere religious belief.

In response to the EEOC's motion for summary judgment, which relied primarily on the Camp Report and the deposition testimony of the three female employees, GEO proffered the testimony of the two GEO wardens. Warden Holm testified that before he became deputy warden at the Hill Facility, he had previously worked as the lead investigator for GEO at the Taft Correctional Institution in Taft, California. In that position, he was responsible for "initial criminal investigation on new crimes committed by inmates, all serious crimes committed by inmates." App. at 169. His "personal focus" was on "internal affairs, violations of the rules by staff." App. at 169. He investigated GEO staff for, among other things, having introduced contraband to prisons, and for "actually selling and distributing controlled substances to inmates." App. at 169. Holm was also the lead investigator of "a fairly large disturbance at the Taft Correctional Facility that involved approximately 900 to 1,000 inmates," an incident that he described as "more or less a riot . . . ." App. at 169. According to Holm, that investigation involved "issues about identification of inmate and video surveillance." App. at 169. Before working with the GEO Group, Holm was a California police officer for 18 years.

In the year after Holm was hired at the Hill Facility, he and Nardolillo made numerous changes to the prison's policies to address what they perceived as the prison's "need[] to . . . improve the performance of the facility and the staff and to enhance security and tighten a few things up." App. at 171. One thing that Holm had noticed was that despite a long-standing, apparently unspoken ban on prison employees wearing unauthorized hats, that ban was not well-enforced. Although the only hats that were authorized were a black baseball hat with the GEO logo on and a knit cap that could be used outdoors, Holm had observed employees wearing unauthorized hats with "different logos, different things that weren't appropriate to the

uniform of the GEO Group," App. at 184, and wearing hats "backwards and sideways," App. at 183. During his deposition, Holm also recalled one incident of an employee wearing a "New York Yankees baseball hat inside the institution while in full uniform." App. at 183.

This concerned Holm in part because of his view that "the band inside of a baseball cap is an excellent place to hide small amount[s] of narcotics and small amounts of contraband. A wire, a small knife, anything can go in there." App. at 183. "[A]nother issue" he had with employees wearing hats was "based on [his] personal experience": the "identification of an individual wearing a hat when they would be inside [the] secure portion [of the prison] . . . where we rely heavily on video surveillance . . . [because a hat] distorts the identity of the individual wearing the cap, which to me is an overall safety and security issue for the prison because it would be entirely possible for an inmate to get a uniform shirt, put a hat on, pull it real close . . . [so that] it distorts the view of their face and you can't tell who they are when they walk out." App. at 183.

Holm's experience was that "during the riot in Taft Correctional Facility based on the review of video surveillance, which is what [GEO] based most of [its] investigation on . . . . there were probably better than 300 or 400 inmates that [GEO] couldn't identify . . . simply because they had a baseball cap on." App. at 184. Moreover, one "inmate put a hat on . . . change[d] [his] shirt . . . pulled [a] hat over his face and walked out the front door." App. at 203. As a result, Holm approached Nardolillo to crack down on employees wearing unauthorized hats and other "headgear."

When asked for additional reasons for why this no-khimar policy was adopted, Holm opined that a head scarf could be "taken away from an individual and used against them, in any form of a choking movement . . . . [i]t could be used as a restraint device . . . [and it] provides unwanted material for inmates to grab ahold of and/or use against [the] staff." App. at 201. Asked to distinguish the safety difference presented by a "head covering" and that presented by "someone's shirt or

11

someone's pants," Holm answered that a khimar, if "grabbed from the behind by the sides of it, . . . immediately becomes a choking instrument," App. at 201, as would a man's tie, an item of clothing also generally forbidden for anyone who "has direct contact with inmates on a daily basis . . . . ," App. at 202. Holm also noted that because a "khimar [has] [a] band right across the forehead and . . . it has the two pieces of material that come down the side of [the] face, anything that casts a shadow on the face, be it from above or the side . . . it casts a shadow," making identification difficult. App. at 202.

Warden Nardolillo also explained that the justification for the new zero-tolerance headgear policy was instituted because "[w]e have had some security issues that were becoming extremely problematic. One primarily being the increased introduction of contraband, specifically drugs, into the institution." App. at 75.

The EEOC characterizes Holm's testimony as "utterly speculative and conclusory." EEOC Br. at 39. However, Holm had significant prior experience in prison administration, and that practical experience adds weight to the concerns that he expressed as the basis for the no-headgear policy. We must therefore decide whether GEO made the necessary showing of the undue hardship defense.

An "undue hardship" is one that results in more than a de minimis cost to the employer. *Webb*, 562 F.3d at 260 (citing *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977)). "Both economic and non-economic costs can pose an undue hardship upon employers . . . ." *Id*. (citations omitted). In deciding whether undue hardship exists, "[w]e focus on the specific context of each case, looking to both the fact as well as the magnitude of the alleged undue hardship." *Id*. (citing *Protos v. Volkswagen of Am., Inc.*, 797 F.2d 129, 134 (3d Cir. 1986)). In *Webb*, we stated that the Supreme Court's decision in *Trans World Airlines*, 432 U.S. at 84, "strongly suggests that the undue hardship test is not a difficult threshold to pass." *Webb*, 562 F.3d at 260. A religious accommodation that creates a genuine safety or security risk can undoubtedly constitute an undue

12

hardship for an employer-prison. As noted above, the specific safety and security risks that GEO asserts regarding the wearing of head coverings in prison are the "smuggling of contraband, misidentification and the use of [a] khimar as a strangulation weapon in a conflict with an inmate." Appellee's Br. at 17.

We agree with the EEOC that the *Webb* court did not purport to establish a per se rule of law about religious head coverings or safety "that would govern in all religious discrimination cases, all 'paramilitary organization' cases, or even all police department cases." Appellant's Br. at 31-32. GEO does not disagree. Nonetheless, *Webb* is relevant to this case by analogy, as some security and uniformity interests held by the police force are also implicated in the prison context.

In its brief to this court, GEO also supports its no headgear policy "due to its effect on [its] legitimate interest [ ] in requiring uniformity of appearance among prison employees to promote an environment of discipline and an *esprit de corps*." Appellee's Br. at 19. It notes that this interest was cited in *Webb* where we stated "that uniform requirements are crucial to the safety of officers (so that the public will be able to identify officers as genuine, based on their uniform appearance), morale and esprit de corps, and public confidence in the police." 562 F.3d at 262 (citing *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 366 (3d Cir. 1999)). The EEOC points out that unlike the City of Philadelphia in *Webb*, GEO's witnesses did not refer to the uniformity of appearance as justification for GEO's dress code policy at the summary judgment stage, suggesting that this was an afterthought that arose only after the *Webb* opinion was filed. In fact, both wardens did testify about their concern regarding the employees' lack of uniform appearance, *see* App. at 77-81 (Nardolillo) and App. at 183 (Holm).[4] Even the EEOC's expert Camp concurred

[4] In *Webb*, there was uncontradicted evidence that the Philadelphia Police Department had a "vital" interest in maintaining its "uniform as a symbol of neutral government authority, free from expressions of personal religion, bent or bias."

13

"that uniformed employees should wear only agency issued visible items." App. at 226. It is unnecessary for us to decide whether this interest alone would support summary judgment, as we decide the case on different grounds.

GEO also argues that the costs that it would incur were it to adopt the accommodation requested by the Muslim employees of allowing them to wear khimars would "cause an undue burden with respect to prison resources." Appellee's Br. at 18. According to GEO, this is because "Muslim female employees can move freely throughout [the prison]" and "[w]hen doing so . . . must pass through numerous checkpoints to pass between secured portions of the facility" including "approximately [sixteen] different entry/exit doors that are monitored by closed-circuit video cameras at which visual identification/recognition is required prior to the door being electronically opened." Appellee's Br. at 18. Although GEO has not entirely convinced us that adopting the proposed accommodations of allowing female Muslim employees to wear khimars but removing them at each checkpoint would require locking down the prisoners in each such location, we recognize that adopting the proposed procedure would necessarily require some additional time and resources of prison officials.

In the last analysis, GEO's no headgear policy must stand on the testimony of Holm and Nardolillo that (1) khimars, like hats, could be used to smuggle contraband into and around the

_____

*Webb*, 562 F.3d at 261. Although neither warden in this case tied the uniformity of appearance requirement to safety concerns, we cannot completely reject their concern about staff wearing unauthorized hats and the need for staff adherence to the dress code in order for the employees to present the appearance of a disciplined prison staff. *See, e.g.*, App. at 78, 84 (Nardolillo); App. at 183, 185 (Holm). Similarly, the concern referred to in *Webb* about the need for police to present an appearance of religious neutrality is also applicable to prison staff, as we can take judicial notice of the prevalence of different religious groups within a prison.

Hill Facility, (2) that khimars can be used to conceal the identity of the wearer, which creates problems of misidentification, and (3) that khimars could be used against a prison employee in an attack. To be sure, GEO acknowledges that "there were no reports of these types of incidents at [the Hill Facility] during Warden Nardolillo's and Warden Holm's tenure[s] at the facility," but we agree with GEO that a prison "should not have to wait for a khimar to actually be used in an unsafe or risky manner, risking harm to employees or inmates, before this foreseeable risk is considered in determining undue hardship." Appellee's Br. at 17. In other words, because "[i]n a prison setting, the safety of the employees and inmates is of top priority . . . . [GEO] should not be prevent[ed] from countering, through appropriate policies, the risks which might be posed by the plaintiff[s'] preferred accommodation." Appellee's Br. at 17.

Even assuming khimars present only a small threat of the asserted dangers, they do present a threat which is something that GEO is entitled to attempt to prevent. To GEO, the fact that inmates have other clothes that could also be used to strangle a guard "does not mean that the facility would be out of line in banning something else which can also be used as such a weapon," especially given that a khimar does not have a legitimate penological justification. Appellee's Br. at 36. It argues that unlike other clothing, "the khimar is already located about the guard's head, virtually around the neck already." Appellee's Br. at 36.

The arguments presented by the parties make this a close case. The EEOC has an enviable history of taking steps to enforce the prohibition against religious discrimination in many forms and its sincerity in support of its arguments against the application of the no headgear policy to Muslim employees wearing khimars is evident. On the other hand, the prison has an overriding responsibility to ensure the safety of its prisoners, its staff, and the visitors. A prison is not a summer camp and prison officials have the unenviable task of preserving order in difficult circumstances.

In *Bell v. Wolfish*, the Supreme Court, albeit faced with

15

different prison regulations that were challenged under the Fourth Amendment, noted that "[t]he Government also has legitimate interests that stem from its need to manage the facility in which the individual is detained." 441 U.S. 520, 540 (1979). The Court also noted that prisons are "unique place[s] fraught with serious security dangers" and therefore the effective management of a detention facility is a valid objective that may justify imposition of various conditions. *Id.* at 559. In that case, the Court cautioned the federal courts to make only limited inquiry into prison management because "[t]he wide range of 'judgment calls' that meet constitutional and statutory requirements are confided to officials outside of the Judicial Branch of Government." *Id.* at 562. Although we do not take those remarks to deter federal courts from upholding the constitutional rights of prisoners and prison staff alike, they must be considered in making the kind of delicate balance called for in this case.

This court's recent opinion in *Webb* held that notwithstanding the sincere religious beliefs of the plaintiff police officer of the need to wear a khimar, that belief was subordinate to the police department's policy prohibiting the wearing of a khimar because "'safety is undoubtedly an interest of the greatest importance.'" *Webb*, 562 F.3d at 262 (quoting *Fraternal Order of Police*, 170 F.3d at 366). The District Court did not err by relying on *Webb* in granting summary judgment to GEO. We reach the same result in balancing the respective considerations here.

We respond to the comments of our dissenting colleague. Judge Tashima takes issue with our acceptance of GEO's explanation that its no-headgear policy was based on its interest in safety, i.e., prevention of the introduction of contraband, and the undue hardship that the proffered accommodations would entail. He has a lengthy discussion impugning the reasons given by Warden Nardolillo and Deputy Warden (later Warden) Holm for the 2005 change in policy. We find that criticism unfairly cynical.

Deputy Holm had transferred to the Hill Facility in 2004,

16

after working for another GEO facility for six years. App. at 170. In that capacity he focused on internal affairs, violations of the rules by the staff, including, inter alia, introduction of contraband. App. at 169. He had previously been a state police officer for eighteen years. App. at 170. Thus, it should not be considered surprising that after he was transferred to the Hill Facility he reviewed the security procedures. His testimony persuasively refutes any suggestion by the Dissent that Nardolillo and Holm were not actually concerned about the introduction of contraband. Holm testified that the issue of contraband was the subject of discussion with Nardolillo "probably close to 100" times. App. at 173. Certainly a prison facility should not be faulted for making changes that strengthened its security policies when reviewed by a new set of eyes.

The Dissent downplays GEO's claim that the accommodations suggested by the EEOC would cause undue hardship. The khimar-switching proposals, either switching khimars or removing them at checkpoints, are facially implausible and time consuming. They would need to be removed, folded, and stored in a locker not yet available. It is worth noting that there are elaborate precautions taken when visitors to the prison wear khimars. A female officer escorts the visitor to the ladies' room where the khimar is removed, the visitor is photographed, and the khimar replaced. This process entails considerable time and effort for the staff, but the authorities deem it necessary to protect against contraband. App. at 102-03, 286.

The Dissent apparently believes it is unlikely that a khimar may be used to strangle the wearer. The Dissent posits the possibility that a khimar could be worn as a bandana is worn. *See* Dissent at 13 n.1. The EEOC never introduced a khimar into evidence. Although khimars may come in different shapes and sizes we note the description adopted by a sister circuit that stated "A khimar is a traditional garment worn by Muslim women that covers the forehead, sides of the head, neck shoulders, chest and sometimes their waist," *EEOC v. Kelly Servs.,* 598 F.3d 1022, 1023 n.1 (8th Cir. 2010) (quotation and

17

citation omitted), a description similar to that provided in the EEOC's complaint. If that were the size of the garment worn by a staff member, the possibility of strangulation should not be taken lightly. Nor does the Dissent explain how allowing Muslim women to wear bandana-like khimars would entirely alleviate the safety concern as a bandana, too, could be used as a weapon. A blanket policy to prohibit all headgear except those issued with the prison uniform seems the sensible solution.

Judge Tashima notes that kitchen employees who frequently interact with prisoners continue to wear hats within the secure facility. Had the EEOC raised that issue in the District Court, GEO undoubtedly would have pointed to Nardolillo's deposition testimony that there were specific safety measures applicable to kitchen workers. App. at 79-80. In fact, the Pennsylvania Administrative Code provides:

> *General requirement.* Employees shall wear hair restraints such as hats, hair coverings or nets, beard restraints and clothing that covers body hair, that are effectively designed and worn to keep their hair from contacting exposed food; clean equipment, utensils and linens; and unwrapped single-service and single-use articles.

7 Pa. Code § 46.152(a). Anyone who has visited a prison will observe many prisoners with long, sometimes unruly, hair, a sanitary concern addressed by the general state requirement that kitchen workers who handle food wear hats. Moreover, the kitchen workers at the Hill Facility were not permitted to wear the hats outside of the kitchen. App. at 80. The Dissent's reference to kitchen hats is just another red herring.

The Dissent appears to place more reliance on the testimony of the EEOC's expert witness than on the testimony of the experienced prison officials on the site at issue. The Dissent's view of how a prison should be run, particularly its minimization of the security concerns that motivated the change in headgear policy at the Hill Facility, runs counter to the direction we have been given by the Supreme Court which

18

stated:

> Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint.  Where a state penal system is involved, federal courts have . . .  additional reason to accord deference to the appropriate prison authorities.

*Turner v. Safley,* 482 U.S. 78, 84-85 (1987).

As the en banc Ninth Circuit recently stated, its obligation is "to comply with the Supreme Court's direction that we not substitute our judgment for that of corrections facility officials." *Bull v. City and Cnty. of San Francisco*, 595 F.3d 964, 978 (9th Cir. 2010) (citation omitted).

## III.

Accordingly, we will affirm the District Court's order granting summary judgment to GEO.

TASHIMA, Circuit Judge, dissenting:

Because I believe the majority misapplies both long-standing Circuit law on how we review summary judgment and, in doing so, ignores our substantive Title VII law, I respectfully dissent.

The GEO Group, Inc., a private corporation, runs the George W. Hill Correctional Facility (the "prison") under contract with Delaware County, Pennsylvania. The Equal Employment Opportunity Commission ("EEOC") sued GEO on behalf of a class of Muslim women employees of GEO, alleging religious discrimination prohibited by Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e, *et seq.* The majority holds that requiring GEO to accommodate the wearing of khimars by its Muslim women employees would work an undue hardship on GEO. But in reaching that conclusion, it chooses to give credence to the testimony of Warden Raymond Nardolillo and Deputy Warden Matthew Holm that khimars pose a threat to safety within the prison, Maj. Op. at 14, and to ignore the ample evidence in the record contradicting and undermining that testimony. In doing so, the majority fails to apply our summary judgment standard of review, which requires us to conduct a plenary review of the record and draw all inferences in favor of the non-moving party. *See, e.g., Webb v. City of Phila.*, 562 F.3d 256, 259 (3d. Cir. 2009). The majority, thus, effectively relieves GEO, as the employer and moving party asserting safety concerns, of the burden of proving the existence of the asserted safety concerns, as well as of the fact and magnitude of the asserted hardship in accommodating plaintiffs religious needs. I cannot agree that this approach and its result are consistent with Circuit law.

Viewing the record in the light most favorable to the non-movant EEOC and the Muslim women employees it represents (collectively, "plaintiffs") and drawing all reasonable inferences from the evidence in plaintiff's favor, GEO has not

1

demonstrated that accommodating plaintiffs' religious practice of wearing a khimar would compromise its interest in safety in a manner that could not be prevented without "work[ing] an undue hardship" upon it such that it is entitled to summary judgment. *Id.* When considered as a whole, the record before us would allow a reasonable jury to find that GEO did not make a good-faith effort to reasonably accommodate the religious practice of its Muslim women employees. *See id.* at 262. That reasonable jury could also find that allowing its Muslim women employees to continue wearing their khimars at work would not work an undue hardship upon GEO. *Id.* I would, therefore, reverse the District Court's grant of summary judgment to GEO.

A close examination of the record reveals that Nardolillo and Holm's testimony about how, why, and when the khimar policy was changed is internally inconsistent and is further called into question by the testimony of other witnesses and GEO's own business records. The record also supports the inference that GEO's stated rationales for banning khimars may be pretextual and are highly speculative. The majority characterizes this analysis of the record as "unfairly cynical." Maj. Op. at 16. I believe that it is merely the application of the proper standard of review. The Supreme Court long ago adopted this Circuit's rule that "'[i]f . . . there is *any* evidence in record from *any* source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 n.2 (1986) (quoting *In re Japanese Elec. Prod. Antitrust Litig.*, 723 F.2d 238, 258 (3d Cir. 1983), *rev'd on other grounds sub nom. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)) (omissions in *Celotex*) (emphasis added). "[A]ny doubt as to the existence of a genuine issue for trial should be resolved against the moving party." *Id.* at 331 n.2.

The majority clearly finds the testimony of Nardillo and Holm to be persuasive, and believes that, as the testimony of "experienced prison officials on the site at issue," it should be given great weight. Maj. Op. at 18. A trier of fact might very well agree, but "at the summary judgment stage, the judge's

function is not himself to weight the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-mided jury could return a verdict for the plaintiff on the evidence presented." *Id.* at 252. We must not engage in the making of "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" as these "are jury functions, not those of a judge, [when] he is ruling on a motion for summary judgment." *Id.* at 254. Thus, the purpose of my "cynical" analysis of the facts is simply to follow the Supreme Court's mandate that "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.*

## Facts

### Carmen Sharpe-Allen

Carmen Sharpe-Allen began wearing the khimar and overgarment that make up the hijab when she converted to the Muslim faith by taking her shahada, nearly a decade before she became a GEO employee. JA 37, 39. Sharpe-Allen wore her full hijab to her November, 2004 interview for a position as a medication nurse at the prison. As a medication nurse, she would be required to visit the cell-blocks within the secure area of the prison on a daily basis. According to the dress code on record in the prison at that time, scarves were not allowed within the prison past a certain security station. Yet that policy appeared not to be enforced, as Sharpe-Allen's practice of wearing a khimar posed no obstacle for her in getting hired.

During the interview, she inquired about whether she would be allowed to wear her religious attire in her new position, because she "wasn't willing to compromise" wearing her khimar. JA 43. The prison dress code required all medical staff members to wear matching scrubs to work, in purple and teal green. JA 43, 209. Because Sharpe-Allen did not own overgarments in the colors of the medical uniform, she told the

3

interviewer, "I would be willing to wear the scrubs, but definitely wasn't compromising my khimar." JA 43. Her interviewer told her that she could wear her khimar, but he would have to ask someone else whether she could wear an overgarment instead of medical scrubs. JA 44. She was offered the job at the interview, and accepted it on the spot. JA 44. Because Sharpe-Allen agreed to wear the uniform medical scrubs with her khimar, no further inquiry was made about the possibility of wearing an overgarment. JA 44.

In 2005, Sharpe-Allen became a chronic infectious disease nurse in the prison. JA 48-49. In this new position, Sharpe Allen was no longer required to go cell-to-cell and began working almost exclusively in the infirmary. JA 49. She would only go to cells if she needed to check the results of inmates' tuberculosis tests. JA 49. Throughout her employment at GEO, she continued to wear her khimar. Sharpe-Allen's khimar posed no safety threat during the time that she was required to go cell-to-cell on a daily basis. Only later, when she was mostly working in an office setting without prisoner interaction, did Nardolillo and Holm claim that her khimar was a so dangerous that it could no longer be worn.

### Marquita King

Marquita King has worn a khimar during all of the years that she has been a practicing Muslim, from 1993 to 2001, and after 2004. JA 124-25. Like Sharpe-Allen, she was hired while wearing traditional Muslim garb. She interviewed for her position as an intake specialist in 2000 while wearing a long dress and overgarment that were part of her religious attire, as well as a khimar and veil over her face. JA 127. Her interviewer asked whether she would be able to remove her veil when she came to work at the prison facility so that her face could be seen. JA 127. King confirmed that she could remove the veil while at work and she was offered the job during her interview and immediately accepted. JA 127. It appears that the job interviewer believed that having a veiled face would compromise safety within the prison and be unacceptable, but wearing only a khimar would not.

4

King worked doing paperwork in an office setting. JA 129. Unlike correctional officers, she did not have keys to the facility. JA 129. The only time that she would interact with inmates was when they would be brought from a holding area to her desk by a correctional officer so that she could input their answers to intake questions into her computer. JA 129.

As a member of the administrative and clerical staff, King was not required to wear a uniform. JA 210. She therefore would not be bound to dress restrictions imposed only on uniform employees, such as wearing only headgear issued with one's uniform. Instead, the dress code applicable to her position only required her to wear professional attire at all times. JA 210. During the years that King was a practicing Muslim and working at the prison, she would wear her khimar with either a long dress that is part of Muslim religious attire or slacks with long shirts. JA 127. As agreed upon in her interview, she did not wear her veil to work. JA 127.

**Rashemma Moss**

Rashemma Moss began working at the prison in 2002 as a correctional officer. As a correctional officer, Moss is the only GEO employee involved in this suit who had to wear a correctional officer uniform, had keys to the facility, regularly worked in the secured areas of the prison with inmates, and responded to use of force incidents. JA 155. Moss did not wear a khimar to her interview, or during the first few years of her employment with GEO, as she was not yet a practicing Muslim. JA 151.

In July of 2005, Moss took her shahada, thereby becoming a full-fledged member of the Islamic faith. JA 151. In lieu of wearing an overgarment, she exchanged her correctional officer uniform for a larger size "to suffice for not showing [her] shape so it wouldn't be tight-fitting." JA 158. To cover her hair in accordance with her religion, Moss began wearing an underscarf, which she described as a "triangle-shaped" piece of fabric that is "tie[d] around [one's] head, under the hat that was issued to her as part of her uniform. JA 156.

5

Moss testified that at that time, "underscarfs was [sic] already being worn," she had already worn one to work on previous occasions and, at that time, "it was common practice [among prison employees] to wear things on [their] head[s], not necessarily an underscarf, but a hat, a scarf, a headband." JA 157.

The record indicates that events stemming from Moss' conversion to Islam prompted the change in the enforcement of the dress code. Moss asked her union representatives whether there was any policy preventing her from wearing a head covering in accordance with her faith and was told that there was not. AR 157. However, Moss decided that it would be best to confirm this with her supervisors at the prison, so in August of 2005, she wrote a "letter to the chief of security informing him that [she] was Muslim, [she] had [taken] her shahada, on what date, what the requirements were that was [sic] stipulated on [her] by [her] religion, and what I have to do." AR 157. Repeatedly receiving no response, she continued informing the next person in the chain of command, eventually writing Warden Nardolillo on October 24, 2005.

**The Prison Dress Code**

The majority's discussion of the prison dress code is inaccurate to the extent that it indicates that the new dress code adopted by Warden Nardolillo in April of 2005 changed the facility's policy on the wearing of hats, caps, khimars, or any other headcoverings in any substantive way. *See* Maj. Op. at 3. Nardolillo did sign a new dress code on April 21, 2005. However, that new policy made only one minor change to the prison's preexisting general grooming standards, which govern the wearing of headgear by employees within the facility. JA 77. The old dress code had prohibited "scarves and hooded jackets or sweatshirts" from being worn past the "mousetrap," which is an area beyond the front desk. JA 77, 207. The new policy prohibited those items from being worn past the "ION SCAN," at the front security desk. JA 77, 207.

The prison's previous dress code had been in effect since

6

February 19, 2004.  JA 207.  Other than the change in location at which scarves and hooded jackets or sweatshirts needed to be removed, both the 2004 dress code and the 2005 dress code contained exactly the same language regarding headgear. Therefore, there was no material in the official prison dress code with regard to hats or headcoverings between 2004, the time at which all three plaintiff Muslim women employees began wearing their khimars to work on a daily basis, and October 24, 2005, when Nardolillo issued a memorandum to employees prohibiting the wearing of hats.

The unchanged portion of the prison's official policy on personal grooming prohibits "alter[ation], modifi[cation], or embellish[ment]" of the standardized uniform provided by GEO. JA 207.  It prohibited "scarves and hooded jackets or sweatshirts" from being worn past a specified security screening location.  JA 207.  And it provided that "[n]o hats or caps will be permitted to be worn in the facility unless issued with a uniform."

Moss testified that the hat she wore to work was issued to her as part of her official uniform.  JA 156.  Under the dress code as written, she should therefore have been allowed to wear the hat within the facility.  This directly contradicts Nardolillo's testimony that no hats could be worn within the facility because no hats were issued with uniforms, as "the hat was not, per se, an official part of the uniform." JA 78.  Nardolillo's claim that a hat was not part of the correctional officer uniform is further contradicted by GEO's own records tracking the uniforms that were issued to its correctional employees.  Those records corroborate Moss' testimony that hats were distributed as part of the uniforms.  JA 78-80.

Nardolillo testified that even if employees were given hats as part of their official uniform, they were not allowed to wear them within the secured perimeter of the facility.  JA 83. Again, this is contradicted by Moss' testimony that various headcoverings were commonly worn by employees within the facility.  JA 157.  It is also contradicted by Nardolillo's own testimony that employees were "wearing whatever they wanted

7

to wear on their heads" until he took action to end this practice. JA 78.

Nardolillo testified that he believed the only appropriate situation in which an employee could wear a head covering was if a guard who worked at the guard shack outside of the secure perimeter of the prison was granted his personal permission to wear a GEO ski cap due to cold winter temperatures. JA 83. However, the plain language of the prison dress code that existed in 2004 and was readopted by Nardolillo in April 2005, allows hats to be worn "in the facility" if they are "issued with the uniform." JA 207. Holm testified that "there has only ever been one official hat issued with the uniform and that was to that first group of employees in 1998 and none of them wore it and it's not in existence anymore." JA 185. That statement is directly contradicted by GEO's own records, which indicate that a cap continued to be issued to correctional officers at the prison as part of their uniform through 2005. JA 80. Nardolillo testified that he did not change the policy of distributing caps to employees as part of their uniforms when he readopted the prison dress code in April of 2005. Plaintiffs presented evidence that hats continued to be commonly worn within the secure areas of the prison just as they had been under the identical and identically unenforced 2004 policy until October 24, 2005.

## The Implementation of the Policy

Moss' letter explaining her religious conversion and requesting permission to continue wearing her khimar reached Nardolillo's desk on October 24, 2005. JA 157. Within hours, Moss was called into Deputy Warden Holm's office to speak with Holm and Nardillo. JA 157. Nardolillo told her that he was denying her request to wear her khimar and was stopping everyone in the facility "from wearing hats and covering their head." JA 159. At this point, Nardolillo presented Moss with the October 24, 2005 memorandum regarding the uniform policy that would later be distributed to all employees. JA 215. The memorandum differed from the official policy that had been adopted in April of 2005, stating that "all hats, caps or religious attire will not be permitted to be worn with your uniform or by

8

non-uniformed employees unless specifically authorized by the Warden." JA 215.

The memo also clarified that "there are no authorized hats, caps or attire, which can be worn inside the jail and there are no exceptions to this policy." JA 215. The lack of a religious exception for hats contrasted with the specific religious exemption to the general grooming standards requirement that "[m]ale staff is to be clean-shaven at all times." This exception was created for men who wear beard for "Medical or Religious reasons" supported by "written documentation." JA 207.

Moss offered to get her Koran from her car to show Nardolillo and Holm that her religion required her to cover her hair, but they told her that would not be necessary. JA 159. They told her that they would be informing the other Muslim women that they could not wear head coverings either. JA 159. Nardolillo or Holm told Moss that she might be "starting a fad or a fashion statement because now others are wearing the same . . . headscarf and hat." JA 159.

Moss requested a religious exception. Nardolillo then told Moss that "no religion will be honored in the jail" and that "he doesn't care if it's a Jewish person with a turban on his head or rosary beads around their neck." JA 159. When Moss asked why Muslim women visitors to the secured area of the prison were permitted to wear their khimars, but she could not, Nardillo replied, "that will be stopped, too." JA 159. Moss then asked why female inmates were permitted to wear khimars. The Warden replied, "[d]ue to Title 37, they have the right of freedom of religion." JA 159. Moss, pointing out that she was not incarcerated, asked why she did not have the same right. JA 159. Nardolillo replied, "[b]ecause you're not. No religion will be honored." JA 159. Nardolillo continued to explain, "this is the battle he's choosing to fight." JA 159.

As Moss was leaving, Nardolillo asked her, "[i]s it really that important to you?" JA 160. She answered, "[y]es, my religion is important to me. Isn't your religion important to you? He said he really didn't think it made that big of a difference."

9

JA 160. These statements clearly indicate that Nardolillo was not interested in providing any sort of religious accomodation.

The contents of the memorandum were announced at roll call that day. The change in policy became "a major topic in the facility." Employees blamed Moss for the policy change, saying that she was responsible "for people that's been [sic] wearing hats for ten years not able to wear a hat anymore." JA 161.

The next day, Moss arrived at work wearing her underscarf and hat as usual. JA 162. First thing, before Moss had reached the ION SCAN, she was called into Holm's office again. JA 162. At that point, "everybody out there still ha[d] on hats," and except for Moss, "none of them [we]re being disciplined or called into the office or told to remove their hats . . . including supervisors." JA 162. She was told that if she continued to wear her headscarf, she would be suspended without pay. JA 162. Moss stopped covering her head at work and continued to work as a correctional officer.

On October 25, 2005, King received a call at home to tell her that she could no longer wear her khimar at work and would need to speak with Nardolillo. JA 131. She called Nardolillo and reported that she had "heard that we were no longer allowed to wear our khimars." JA 131. Nardolillo confirmed the news, and said "if you show up to work, you will be fired if you have a khimar on your head." JA 131. King responded that she had been "hired with [her] khimar on . . . [and] was just in [his] office last month with [her] khimar, and there was not an issue with it." JA 131-32. Nardolillo replied that "he didn't care, this is what he's saying now." JA 132.

King took several weeks of medical leave due to stress. JA 134. When she returned to work, she wore her khimar until she arrived in the parking lot, and then took it off as she entered the building. JA 134.

Sharpe-Allen was out on a medical leave during October 2005. JA 52. Her sister, who also worked at the prison at that time, called her to tell her that the she could no longer wear her

10

khimar when she was ready to return to work. JA 52. Her human resources representative confirmed this, and so Sharpe-Allen asked to meet with the warden. JA 54. She met with Nardolillo twice, hoping to get his permission to continue wearing her khimar on the job. JA 62. Wearing her khimar during the meetings, Sharpe-Allen "stressed the fact that [she has] been here and . . . [is] doing [her] job . . . [and has] never given [him] any problem. [Her] khimar hasn't interfered." JA 61. Nardolillo "wasn't willing to compromise at all." JA 61. He told her that she "wouldn't get in the building" as long as she showed up for work wearing her khimar. JA 62. Nardolillo then terminated Sharpe-Allen, asserting that she had "effectively abandoned her job" by "refus[ing] to comply with [his] directive to return to work with the wearing of her Kimar [sic]." JA 216-17.

### The Asserted Rationale for the Policy

Nardolillo and Holm have provided shifting testimony about their rationales for the prison's change in dress code policy. At times, their testimony indicated that the decision to ban all headgear was motivated by a concern about employees appearing unkempt and out of uniform. Nardolillo testified that prior to the policy change, uniformed security officers were "wearing hats inside, various and sundry type hats," with "different baseball team logos," which did not have GEO logos on them. JA 78. Nardolillo thought "it didn't look well. It was not a uniformed appearance." JA 78. Holm also testified that he wanted to change the dress code because he was unhappy that he saw a "New York Yankees baseball hat inside the institution while in full uniform, [which was] not authorized" as well as "hats being worn backwards and sideways." JA 183.

The majority focuses on testimony that the policy change was instead "prompted" by security issues. JA 75. Nardolillo stated that "[p]rimarily," he was having a problem with the increased introduction of contraband, specifically drugs, into the institution." JA 75. Holm hypothesized that "the band inside of a baseball cap is an excellent place to hide a small amount of narcotics and small amounts of contraband." JA 183. Holm

11

recalled that at another facility, he had encountered a problem identifying which prisoners had been involved in a riot because they had baseball caps on. JA 184. This gave him concerns that "the identification of an individual wearing a hat when they would be inside . . . the secure portion of our institution where we rely heavily on video surveillance" would be difficult and create safety or escape risks. JA 184. Holm later asserted that khimars pose a special risk that hats do not because "scar[ves] and hoods . . . can be taken away from an individual and used against them, in any form of choking movement." JA 201.

GEO presented no evidence whatsoever that any employee head covering has ever been used in the prison to smuggle contraband, to conceal a prisoner's identity, or as a weapon. JA 220. Plaintiffs presented expert testimony that called into question whether the safety risk that Nardolillo and Holm feared from Khimars actually existed. For example, although Nardolillo testified that he banned headcoverings in response to an increased introduction in contraband, the prison had not actually experienced any increase in contraband introduction through employees. JA 224. Plaintiffs' expert noted that "not one of the 359 [total] serious contraband reports involved secreting contraband in a cap, hat, or khimar, and only two involved a staff member." JA 222. Of these two staff-related contraband incidents, representing only approximately half a percent of total contraband reports, one involved a correctional officer bringing food and cigarettes in his jacket pocket, and the other involved a kitchen worker who was found with cigarettes and latex gloves in his sock. JA 224. It is worth noting that kitchen workers continue to wear hats as part of their uniform, including during their daily interactions with prisoners during meals. JA 80. After the headgear policy change, "the amount of contraband found by staff did not decrease." JA 220.

The expert also opined that khimars would not create difficulty in identifying employees because they can "be worn in such a manner so as not to inhibit visual identification of the employee, and even if it were, the temporary removal of the khimar to verify/confirm the employee's identification could be easily accomplished." JA 226. Furthermore, he pointed out that

12

a khimar's ability to obscure a prisoner's identity, allowing him to escape, does not differ from that of any other piece of clothing or fabric present in the prison. JA 226-27. He also concluded that GEO's concerns that a khimar could be used as a strangulation device were similarly unsupported, as any item of clothing can similarly be used for strangulation. JA 227-28. Neither Sharpe-Allen nor King regularly work within the secure perimeter of the prison, have frequent contact with prisoners, or participate in use of force events. Moss testified that she wore her underscarf in a manner that fit underneath a baseball cap, which seems to indicate that it could be tied like a bandana, and would not be tied under the neck.[1]

According to the expert report, "all of the other jurisdictions" he surveyed "permit staff to wear uniform caps and or hats within their facilities," including jurisdictions in eight states, the District of Columbia, and the Federal Bureau of Prisons. JA 230. In particular, "[b]oth New York City and the District of Columbia correctional systems permit correctional officers and other female employees to wear the khimar within the secure perimeter of their facilities without adverse consequences." JA 230.

## DISCUSSION

### The Majority Applied the Wrong Legal Standard

---

[1] The majority credits GEO's assertion that one of the safety hazards posed by wearing a khimar is that it "could be used against a prison employee in an attack." Maj. Op. at 14. This is based on Holm's testimony that a khimar could be used in the "form of a choking movement . . . used against the staff." *Id.* at 11. This testimony assumes that the only way to wear a khimar is to tie it under the chin at the neck. But GEO never explored a possible accommodation of permitting the wearing of a khimar as a bandana would be worn, *i.e.*, not tied under the chin at the neck, or any other similar accommodation, or of wearing a bandana, underscarf, or smaller piece of fabric in lieu of a khimar, as Moss apparently was already doing.

13

The majority's holding that "[e]ven assuming khimars present only a small threat of the asserted dangers, they do present a threat which is something that GEO is entitled to attempt to prevent," Maj. Op. at 14, represents an unexplained shift from our established jurisprudence. The majority's approach allows an employer facing an asserted safety concern freely to discriminate on the basis of religion by merely inventing a *post-hoc* safety rationale for its refusal to accommodate its employees' religious practices. An employer cannot evade liability for religious discrimination by merely asserting that it has a legitimate business interest, no matter how important, for refusing to accommodate an employee's religious practice. Rather, the burden is on the employer to show that accommodating the employee's religious practice "would impose more than a de minimis cost on the employer." *Webb*, 562 F.3d at 260. As we said in *Webb*, that cost may be an a non-economic cost, such as creating a safety risk. *Id.* However, the majority has failed even to perform the necessary inquiry into whether making a religious exception from the general headgear ban to accommodate khimars would, in fact, impose such an undue hardship on GEO.

The majority's approach creates an exception to the normal burden-shifting rule, which is an established part of our Title VII analysis when safety is the employer's asserted rationale. The majority acknowledges that the District Court did not made any finding or reach any conclusion about the existence of an undue hardship. Maj. Op. at 14. By the majority's own admission, this is also "a close case." *Id.* at 15. But the majority concludes nonetheless that "[e]ven assuming khimars present only a small threat of the asserted dangers, they do present a threat which is something that GEO is entitled to attempt to prevent." *Id.* at 14. The majority thereby effectively exempts GEO from Title VII's requirement that an employer must prove that its hardship is more than *de minimis*; instead, it concludes that this requirement is met merely because GEO has asserted that its hardship is safety. The majority, in effect, establishes a *per se* rule that when an employer asserts that its rationale for denying a religious accommodation is safety, the employer need not adduce any evidence to prove the existence

14

of, let alone the magnitude of, the burden it would suffer by accommodating the religious practice. This is error, especially in light of plaintiffs' evidence to the contrary.

I agree with the majority that "'safety is undoubtedly an interest of the greatest importance." *Webb*, 562 F.3d at 262 (quoting *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359 (3d. Cir. 1999)). Certainly, "Title VII does not require that safety be subordinated to the religious beliefs of an employee." *Draper v. U.S. Pipe & Foundry Co.*, 527 F.2d 515, 521 (6th Cir. 1975). The importance of the employer's interest, however, does not *ipso facto* relieve the employer of its burden of proof. It is established law in this Circuit that "'[t]he *magnitude* as well as the *fact* of hardship must be determined by the examination of the facts of each case.'" *Protos v. Volkswagen of Am., Inc.*, 797 F.2d 129, 134 (3d. Cir. 1986) (quoting *Tooley v. Martin-Marietta Corp.*, 648 F.2d 1239, 1243 (9th Cir. 1981)). On this record, a reasonable jury could easily find that GEO has proven neither the fact nor magnitude of its asserted hardship.

### Plaintiffs Have Raised Disputed Questions of Material Fact of GEO's Asserted Safety Interest

Plaintiffs also have raised a disputed question of fact as to whether safety was even the reason that GEO changed its policy about head coverings. The shifting testimony of Nardolillo and Holm is internally inconsistent. At times, they testified that they when they decided to ban hats, they were motivated by safety concerns. On other occasions, they testified that they just did not like the way it appeared to have employees commonly wearing various non-uniform hats. A jury could infer that GEO's inconsistent and shifting rationale for its change in policy is "evidence tending to show pretext." *Abrahamson v. William Patterson Coll. of N.J.*, 260 F.3d 265, 284 (3d. Cir. 2001).

It would be perfectly reasonable for a jury to find, despite Nardolillo and Holm's testimony, that safety concerns did not actually motivate them to change the hat policy. Such a finding would be supported by the fact that the changes to the dress code

15

in April 2005 did not actually include any changes to the hat policy, and that plaintiffs introduced evidence that hats continued to be commonly worn within the secure perimeter of the facility after the adoption of the new version of the dress code in April 2005. One could assume that if concern about the safety of hats had motivated the adoption of the April 2005 dress code, the new dress code would include revised language on hats, hats would have ceased to be issued with uniforms, hats would have been banned for all employees, and the new policy would have been implemented immediately.

A finding that the ban on khimars was not motivated by safety would be further bolstered by the fact that plaintiffs introduced evidence that GEO did not make any attempt to stop employees from wearing hats or khimars in the facility until the very day that Nardolillo became aware of Moss' request for permission to wear her khimar, and by the fact that after the issuance of the October 24, 2005 memorandum, Moss was singled out for reprimand for wearing her khimar the next day, while other correctional officers continued to wear their secular hats without incident. Additionally, kitchen employees who interact with prisoners on a more frequent basis than either Sharpe-Allen or King continue to wear hats within the secure facility. Further, two of the plaintiff-employees do not even work regularly within the secure areas of the prison.

The testimony of Nardolillo and Holm about their motivations simply does not match up with the evidence of their actions. Moss testified that Nardolillo told her that he did not want her "starting a fad or a fashion statement," that "[n]o religion will be honored" in the prison, and that religion was simply not important to him. JA 159-160. These contemporaneous statements directly contradict his later-asserted rationales for the change in policy. A reasonable jury could conclude that Nardolillo and Holm, were not actually motivated by any safety concerns about head coverings and, consistent with that mindset, did not take any actions to limit the wearing of hats in April 2005. Rather, when they became aware of Moss' request to wear a khimar in October of 2005, they discriminatorily decided to deny it, and decided they would

16

rather ban all hats than allow khimars to be worn.

Even assuming that safety was the motivating factor behind the prohibition on hats within the facility, based on the record before us, plaintiffs have raised a disputed question of fact as to whether accommodating the wearing of khimars actually creates a significant safety risk. It is error for the majority to conclude, relying solely on the speculative testimony of Nardolillo and Holm that the wearing of khimars creates a safety risk, Maj. Op at 14, in the face of all of the evidence in the record to the contrary. GEO is not entitled to judgment simply because its officials have conclusorily recited imagined and hypothetical situations in which khimars could pose potential safety problems.

In order to succeeded on a motion for summary judgment, GEO cannot merely recite hypothetical safety concerns. It must adduce evidence that accommodating the wearing of khimars would have caused safety risks. As the Sixth Circuit has observed, the notion that an employer's mere assertion of speculative and hypothetical safety concerns can serve as the basis of an undue hardship is contrary to Title VII's burden of proof on the employer. In *Draper v. U.S. Pipe & Foundry Co.*, 527 F.2d 515, 521 (6th Cir. 1975), the employer asserted that allowing an employee to take Saturdays off for religious observances would compromise safety because it would require some employees to work longer than eight hour shifts, which would be dangerous because they worked around sophisticated and potentially dangerous electrical equipment. While recognizing that safety concerns are "highly relevant" to the employer's refusal to offer an accommodation, the court rejected the employer's unsupported argument that an accommodation would create a safety risk because the employer had not actually proven the fact of the claimed risk. The court found that the record indicated that employees "not infrequently are required to work more than eight hours in one day," so allowing such a practice would not be an undue hardship. *Id.*

The safety arguments advanced by GEO suffer from the same logical flaws and insufficient proof as the safety arguments

17

rejected in *Draper*. GEO argues that all hats and khimars are unsafe, yet offers no explanation for why it (presumably safely) allows kitchen workers to continue to wear headcoverings during daily interactions with prisoners. The number of Muslim women who seek a religious accommodation to wear khimars is likely smaller than number of kitchen staff who wear hats around prisoners daily. Furthermore, the Muslim women employees perform a variety of jobs, serving as correctional officers, nurses, and intake specialists. In this wide range of positions, many have far less prisoner interaction than the kitchen staff.[2]

Nardolillo and Holm's testimony about their safety concerns becomes much less convincing when it is considered with the healthy skepticism required on review of summary judgment. For example, Holm testified that he had difficulty identifying which prisoners were involved in a riot in a California prison because they were all wearing hats. But this case is not about whether all prisoners should be issued hats, or

---

[2]     GEO's kitchen is staffed by a mix of outside employees and inmates who work daily side-by-side in the kitchen. App. at 80. As the majority notes, all of these workers, employees and inmates a like, wear hats in order to comply with a Pennsylvania Administrative Code hygienic requirement applying to food workers. Maj. Op. at 17-18 (quoting 7 Pa. Code § 46.152(a)). Although GEO maintains no written policy against kitchen employees wearing their hats outside of the kitchen, Nardolillo testified that it is "just practice" that the hats are worn only in the kitchen. App. at 80. One could argue that if GEO were truly interested in safety, it could comply with the regulation by providing its kitchen workers with hair nets instead of hats, which would reduce the risk of secreting contraband inside them. That GEO has chosen, instead, to provide both inmates and employees who work side-by-side with hats would seemingly indicate that it does not view every hat as a potential safety threat. I also find it curious that GEO apparently has little difficulty safely accommodating headgear required by the Pennsylvania regulation, while at the same time claiming undue hardship in accommodating headgear worn by Muslim employees, as required by Title VII.

whether all correctional officers should be allowed to wear hats. It is only about whether the religious practice of a few Muslim women employees, most of whom do not work as correctional officers, can be reasonably accommodated. The potential risk for obscured identity created by allowing a handful of correctional officers to wear underscarves does not remotely compare with the same risk created by issuing to or permitting the wearing of hats by hundreds of inmates.

On summary judgment, we must draw all inferences favorably to plaintiffs, because they are the non-moving parties. The assertion that khimars are a threat to safety in GEO's facilities is a factual one that has been vigorously disputed by plaintiffs, who presented ample evidence, including expert evidence, that khimars pose no threat at all. The correctional facilities in "Connecticut, Delaware, Massachusetts, Pennsylvania, Rhode Island, New York City, New York State, the District of Columbia, Indiana, Oklahoma, and the Federal Bureau of Prisons" allow all staff to wear headgear in their facilities. One can safely assume that these jurisdictions are not sacrificing safety for their employees' freedom of religion or even of style. Plaintiffs' expert noted that there had never been any contraband incidents involving headgear, and that the amount of contraband found by staff did not decrease after the dress code change of April 2005, nor did it decrease subsequent to the October 24, 2005 memorandum. JA 220. He noted that "[c]omparing the types of serious contraband items reported prior to the change in the khimar policy on October 24, 2005, with a comparable length of time after it was changed, reveals that the number of contraband items found at the facility actually rose by 91 percent." JA 220.

The majority misapplies the summary judgment standard in taking Nardolillo and Holm at their word that khimars pose even a "small threat" to prison safety. When the facts are interpreted in the light most favorable to plaintiffs, as the law requires on summary judgment, one must conclude that there are genuine disputed issues of material fact as to whether khimars pose a safety threat in the prison context.

19

Furthermore, whether that alleged safety risk can be alleviated by any measure short of banning all khimars worn by Muslim women employees, performing any job function, without working an undue hardship on GEO is an additional disputed question of fact. Moreover, even if the existence of a safety risk had been conceded by plaintiffs, GEO would not be entitled to summary judgment without demonstrating that the safety risk could not be remedied by some other measure short of banning khimars without imposing an undue burden on GEO. The majority does not even proceed to conduct this inquiry.

The majority acknowledges that GEO has argued "that the costs that it would incur were it to adopt the accommodation requested by the Muslim employees of allowing them to wear khimars would 'cause an undue burden with respect to prison resources.'" Maj. Op. at 13-14 (quoting Appellee's Br. at 18). The majority then admits that GEO "has not entirely convinced us that adopting the proposed accommodation of allowing female Muslim employees to wear khimars but removing them at each checkpoint would require locking down the prisoners in each such location." *Id.* at 14. *Id.* However, there has not yet been an opportunity for a finder of fact to determine whether or not accommodating khimars would cause more than a *de minimis* hardship.

Plaintiffs have raised a material question of fact as to the magnitude of the burden that GEO would bear by accommodating their khimars. Here, a reasonably jury could find that it would not impose an undue hardship on GEO to allow Muslim women employees to wear khimars. In the first instance, it is unclear why GEO would require Muslim women employees to remove their khimars at each checkpoint. It cannot be in order to check them for contraband, as they do not perform the same checks on socks or jackets – the only items of staff clothing ever to have been found to secrete contraband. And it is a disputed question of fact whether it would even be necessary for identification purposes, given that removal of hats, when they were in common use, was never required for identification purposes at these very same checkpoints. The khimars worn by plaintiffs do not include veils over their faces. GEO does not

20

explain why women in khimars cannot be adequately identified via closed circuit video cameras simply by looking at the camera, thereby ensuring that the camera has an unobstructed view of their faces, before they are allowed to pass.

The majority is not persuaded by plaintiff's evidence that their suggested accommodation would not cause undue hardship. It concludes that "[t]he khimar-switching proposals, either switching khimars or removing them at checkpoints, are facially implausible and time consuming." Maj. Op. at 16. In so concluding, the majority again engages in improper weighing of the evidence. *See Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, Inc., 998 F.2d 1224, 1230 (3d. Cir.1993) ("at the summary judgment stage, a court is not to weigh the evidence or make credibility determinations. Instead, these tasks are left for the fact-finder.") (citation omitted). Determining the magnitude of GEO's burden is a task for the finder of fact, not an appellate court. *Id.* To defeat summary judgment, Plaintiffs do not need to convince the Court that the accommodating khimars would not impose an undue burden on GEO. They need only produce enough evidence to create a disputed question of fact as to the magnitude of the burden that an accommodation would impose. Because Plaintiffs have done so, GEO is not entitled to summary judgment.[3]

---

[3] It is clear that the majority has unabashedly adopted GEO's view of the evidence as the "facts" that control this case. *See, e.g.,* Maj. Op. at 18 ("The Dissent appears to place more reliance on the testimony of the EEOC's expert witness than on the testimony of the experienced prison officials on the site at issue."). It does so under the guise of complying with the "direction we have been given by the Supreme Court." *Id.* (quoting *Turner v. Safley*, 482 U.S. 78, 84-85 (1987) ("federal courts [should] accord deference to the appropriate prison authorities")). But *Turner* does not even inform, much less control, the issues in this case. It involved a facial constitutional challenge to a prison regulation. *Turner* involved neither the standard of reviewing evidence on the grant of summary judgment nor the obligations of a private employer under Title VII.

### *Webb* Does Not Control This Case

The District Court, in granting summary judgment to GEO, held that *Webb* was dispositive, concluding that there was "no meaningful distinction between prison guards and similar personnel, on the one hand, and police officers." *EEOC v. GEO Group, Inc.*, 2009 WL 1382914 (E.D. Pa. 2008). The majority elides this issue, *see* Maj. Op. at 13 ("It is unnecessary for us to decide whether this interest alone would support summary judgment, as we decide the case on different grounds."), but I must address it because I disagree that this case can be decided in GEO's favor "on different grounds."

Because GEO has not met its burden of proving the fact or the magnitude of the burden to its safety interest that it would bear by allowing a religious accommodation for khimars, I now turn to whether GEO's asserted interest in the uniform appearance of it's employees justifies the ban on khimars under *Webb*. We held in *Webb* that requiring the Philadelphia Police Department to allow Muslim women police officers to wear khimars while on duty would work an undue hardship upon it because it would compromise the police department's interest in promoting the essential values of "impartiality, religious neutrality, uniformity, and the subordination of personal preference." *Webb*, 562 F.3d 256, 261 (2009).

GEO argues that it is entitled to summary judgment as a matter of law because it has asserted an interest in uniform dress among a "'paramilitary law enforcement unit'" similar to the police. *Id.* at 262 (quoting *Thomas v. Whalen*, 51 F.3d 1285, 1291 (6th Cir. 1995)). However, the interest in uniformity that Nardolillo and Holm actually testified to was not akin to the interest recognized in *Webb*. Nardolillo and Holm were concerned that their employees looked sloppy wearing whatever they wanted on their heads. The Philadelphia police department was concerned about "the safety of officers (so that the public will be able to identify officers as genuine, based on their uniform appearance), morale and esprit de corps, and public confidence in the police." *Id.* (discussing *Fraternal Order of Police*, 170 F.3d at 366).

Prison employees, unlike police officers, do not serve as an impartial symbol of law enforcement authority to the general public. There is no evidence, for example, that a prisoner would think a GEO employee wearing a khimar was not a genuine GEO employee. There is also no evidence that any prisoner has ever expressed a concern that they are being discriminated against because of the religious affiliation of a GEO employee, as indicated by that employee's wearing of a khimar. There is no evidence that being a prison guard requires the same level of cohesiveness and esprit de corps of a paramilitary organization such as the police.[4]

There was also no indication in *Webb* that the Philadelphia Police Department also sought to prohibit non-uniformed employees who did not regularly interact with the public from wearing khimars, as GEO does. Prison nurses and intake officers certainly do not share the same safety or morale concerns as sworn police officers, because they are not trained or expected to participate in use of force events. Additionally, given that neither King nor Sharpe-Allen are classified as uniformed employees, it is disingenuous, at best, for GEO to argue that it would work an undue hardship to allow them to wear non-uniform attire. In fact, they are not uniformed guard-employees with routine access to the prison's secure areas.

The record before us indicates that GEO's interest in uniformity only encompassed an aesthetic disapproval of employees starting a "fad or fashion statement" by wearing

---

[4] On the factors *Webb* found dispositive, the record was uncontroverted and consisted largely of the affidavit of the Police Commissioner. *See Webb*, 562 F.3d at 261. Here, the record is highly controverted and the only expert declaration was submitted by plaintiffs. Moreover, GEO is a private corporation which runs the prison under contract. One could argue that one reason which supports the contracting out of prison administration to a private corporation is that, unlike a metropolitan police department, a prison need not be run by an official, governmental, para-military organization.

khimars.  JA 159.  That concern is not equivalent to those we found to be "'of the greatest importance'" in *Webb*.  *Id.* (quoting *Fraternal Order of Police*, 170 F.3d at 365).  *Webb* does not control this case.  GEO is free to ban its employees from wearing Yankees caps backwards and sideways if they just do not like the way they look.  But they are not free to ban khimars for the same reason.

**The Alternative Accommodation Offered by GEO Is Unreasonable as a Matter of Law**

Having concluded that issues of material fact remain with respect to GEO's arguments that accommodating khimars would work an undue burden upon their interests in safety and uniformity, I next consider whether GEO "made a good-faith effort to reasonably accommodate the religious beliefs" of plaintiffs.  *Id.* at 259.  GEO argues that it did offer a reasonable alternative accommodation, allowing them to wear a hairpiece, presumably a wig, instead of a khimar.  An accommodation is reasonable if it "eliminates the conflict between employment requirements and religious practices by allowing the individual to observe fully."  *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 70 (1986).  GEO contends that wearing a wig would eliminate the religious conflict of having uncovered hair for its Muslim women employees because their natural hair would be covered by synthetic hair.  It further asserts that the fact that one Muslim woman employee allegedly agreed to wear such a hairpiece instead of a khimar is evidence that the offered accommodation would resolve class members' religious conflicts.

The offered accommodation is not reasonable and was rightly rejected by the majority.  Maj. Op. at 9.  The Koran teaches that women must "guard their modesty" by wearing a khimar to cover their hair, heads, neck, and breast.  JA 28-29.  Plaintiffs maintain that covering their hair with natural-looking synthetic hair would not achieve that goal and eliminate the

24

religious conflict at issue.[5]  GEO has not questioned the sincerity of this religious belief.  Therefore, under our religious accommodation precedents, this assertion is enough to resolve the question of whether the offer of an alternate hairpiece accommodation was reasonable.

An employer is not entitled to interpret the employee's religion and determine what is and is not religiously acceptable to them.  For example, in *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1576 (7th Cir. 1997), two Jewish employees requested Yom Kippur off from work so that they could observe the religious holiday.  The employer offered the employees another day off instead to observe the holiday.  The Court held that this was not a reasonable accommodation.  Just as it is not reasonable to ask a Christian employee to observe Christmas in July, it is not reasonable to ask a Muslim woman who must hide her hair to appear in public displaying a full head of hair.  GEO's assertion that it has found one person who would agree to such a scheme does not prove that it is a reasonable accommodation.  It is neither the court's nor the employer's prerogative to dictate to an employee how she should comply with the requirements of her religion.  As the majority observes, "[w]e are unwilling to delve into any matters of theology."  Maj. Op. at 9.

**Conclusion**

Today the majority ignores the facts in the record and the well-established standard for reviewing them on summary judgment.  In doing so, it establishes an unwise and unworkable exception that makes a shambles of our Title VII religious accommodation jurisprudence.  The record in this case is full of contradictions.  It is impossible to tell whether, at what point, and how the prison's dress code and uniform were ever officially changed, or whether the warden simply changed his mind about allowing hats and khimars in the prison and for what reason.

---

[5]     Further, under the safety rationale, one could argue that contraband could be more easily hidden under a wig than under a khimar.

25

Having demonstrated that there are triable issues of material fact in this case, plaintiffs deserve their day in court so that a jury can consider the parties conflicting accounts and determine what the facts are. Because I would reverse the district court's grant of summary judgment to GEO, I respectfully dissent.