

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-7-2009

# Kimberlie Webb v. City of Philadelphia

Precedential or Non-Precedential: Precedential

Docket No. 07-3081

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"Kimberlie Webb v. City of Philadelphia" (2009). *2009 Decisions.* Paper 1447.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1447

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 07-3081

KIMBERLIE D. WEBB,
                              Appellant

v.

CITY OF PHILADELPHIA

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Civil Action No. 05-cv-5238
(Honorable Harvey Bartle III)

Argued September 9, 2008
Before:  SCIRICA, *Chief Judge*,
McKEE and SMITH, *Circuit Judges*.

(Filed: April 7, 2009)

JEFFREY M. POLLOCK, ESQUIRE (ARGUED)
ABBEY T. HARRIS, ESQUIRE
Fox Rothschild LLP
Princeton Pike Corporate Center, Building 3
997 Lenox Drive
Lawrenceville, New Jersey 08648

SEVAL YILDIRIM, ESQUIRE
Whittier Law School
3333 Harbor Boulevard
Costa Mesa, California 92626
        Attorneys for Appellant

ELEANOR N. EWING, ESQUIRE (ARGUED)
City of Philadelphia Law Department
One Parkway
1515 Arch Street, 17th Floor
Philadelphia, Pennsylvania 19102
        Attorney for Appellee

JOHN S. GHOSE, ESQUIRE
FRED T. MAGAZINER, ESQUIRE
Dechert LLP
Cira Centre , 18th Floor
2929 Arch Street
Philadelphia, Pennsylvania 19104
        Attorneys for Amici Curiae/Appellant,
        American Civil Liberties Union of Pennsylvania,

American Civil Liberties Union,
Council on American Islamic Relations,
Majlis Ash'Shura, American Muslim Law
Enforcement Officers Association,
Islamic Society of North America,
Muslim Public Affairs Council,
Muslim Alliance in North America,
Muslim American Society Freedom Foundation,
The Sikh Coalition, and Shalom Center

---

OPINION OF THE COURT

---

SCIRICA, *Chief Judge*.

In this employment discrimination case, the issue on appeal is whether a police officer's request to wear religious garb with her uniform could be reasonably accommodated without imposing an undue burden upon the City of Philadelphia. On the facts presented, the District Court held it could not. *Webb v. City of Philadelphia*, No. 05-5283, 2007 U.S. Dist. LEXIS 46872 (E.D. Pa. June 27, 2007). We agree.

I.

Kimberlie Webb is a practicing Muslim, employed by the City of Philadelphia as a police officer since 1995. On February

3

11, 2003, Webb requested permission from her commanding officer to wear a headscarf while in uniform and on duty. The headscarf (a khimar or hijaab) is a traditional headcovering worn by Muslim women. Webb's headscarf would cover neither her face nor her ears, but would cover her head and the back of her neck. Her request was denied in view of Philadelphia Police Department Directive 78, the authoritative memorandum which prescribes the approved Philadelphia police uniforms and equipment. Nothing in Directive 78 authorizes the wearing of religious symbols or garb as part of the uniform.[1]

On February 28, 2003, Webb filed a complaint of religious discrimination under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e-2(a)(1), with the Equal Employment Opportunity Commission (EEOC) and the Pennsylvania Human Relations Commission. On August 12, 2003, while the matter was pending before the EEOC, Webb arrived at work wearing her headscarf. She refused to remove it when requested and was sent home for failing to comply with Directive 78. The next two days' events were indistinguishable: Webb arrived at work in her uniform and her headscarf, which she refused to remove,

---

[1]Directive 78 restricts what constitutes a permissible police officer uniform in specific detail. According to Philadelphia Police Commissioner Sylvester Johnson, *"*[o]ur dress code is very, very strict. . . . And it specifically tells you the things that you can wear. If those things are not on there, then it is prohibited based on our Directives."

4

and was then sent home.  On August 14, Webb was informed her conduct could lead to disciplinary action.  Thereafter, she reported to work without a headscarf.  Disciplinary charges of insubordination were subsequently brought against Webb, resulting in a temporary thirteen-day suspension.

On October 5, 2005, Webb brought suit against the City of Philadelphia,[2] asserting  three causes of action under Title VII—religious discrimination, retaliation/hostile work environment, and sex discrimination—and one cause of action under the Pennsylvania Religious Freedom Protection Act (RFPA), 71 Pa. Stat. Ann. § 2401.  The District Court found that Directive 78 and "[its] detailed standards with no accommodation for religious symbols and attire not only promote the need for uniformity, but also enhance cohesiveness, cooperation, and the esprit de corps of the police force." *Webb*, 2007 U.S. Dist. LEXIS 46872, at *11–12.  The District Court held the City would suffer an undue hardship if forced to permit Webb and other officers to wear religious clothing or ornamentation with their uniforms.  The District Court granted summary judgment on all claims, finding Webb failed to exhaust her administrative remedies for the Title VII sex discrimination

---

[2]The Complaint identified three defendants: the City, the Philadelphia Police Department, and Police Commissioner Sylvester Johnson.  The District Court granted Defendants' motions to dismiss the Police Department and Commissioner Johnson as defendants.  These orders were not appealed.

5

claim, failed to meet the statutory notice requirements for the RFPA claim, and failed to raise a genuine issue of material fact for the Title VII religious discrimination and retaliation/hostile work environment claims.

Webb appeals only the adverse judgments on the religious discrimination and sex discrimination claims. She also raises, for the first time on appeal, certain constitutional claims. The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. We have jurisdiction under 28 U.S.C. § 1291.

"We undertake a plenary review of grants of summary judgment." *Huber v. Taylor*, 469 F.3d 67, 73 (3d Cir. 2006). "We view all evidence and draw all inferences therefrom in the light most favorable to the non-movant, affirming if no reasonable jury could find for the non-movant." *Shelton v. Univ. of Med. and Dentistry of N.J.*, 223 F.3d 220, 224 (3d Cir. 2000).

> [A]n appellate court may only review the record as it existed at the time summary judgment was entered. In reviewing a summary judgment order, an appellate court can consider only those papers that were before the trial court. The parties cannot add exhibits, depositions, or affidavits to support their position. Nor can they advance new theories or raise new issues in order to secure a reversal of the lower court's determination.

6

*Union Pac. R.R. Co. v. Greentree Transp. Trucking Co.*, 293 F.3d 120, 126 (3d Cir. 2002) (internal citations omitted).

## II.

Title VII of the 1964 Civil Rights Act prohibits employers from discharging or disciplining an employee based on his or her religion. 42 U.S.C. § 2000e-2(a)(1). "Religion" is defined as "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). To establish a prima facie case of religious discrimination, the employee must show: (1) she holds a sincere religious belief that conflicts with a job requirement; (2) she informed her employer of the conflict; and (3) she was disciplined for failing to comply with the conflicting requirement. *Shelton*, 223 F.3d at 224. Once all factors are established, the burden shifts to the employer to show either it made a good-faith effort to reasonably accommodate the religious belief, or such an accommodation would work an undue hardship upon the employer and its business. *Id.*

Title VII religious discrimination claims often revolve around the question of whether the employer can show reasonable accommodation would work an undue hardship.

7

*United States v. Bd. of Educ.*, 911 F.2d 882, 886 (3d Cir. 1990).[3] An accommodation constitutes an "undue hardship" if it would impose more than a *de minimis* cost on the employer. *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977). Both economic and non-economic costs can pose an undue hardship upon employers; the latter category includes, for example, violations of the seniority provision of a collective bargaining agreement and the threat of possible criminal sanctions. *Id.* at 83; *Bd. of Educ.*, 911 F.2d at 891.

We focus on the specific context of each case, looking to both the fact as well as the magnitude of the alleged undue hardship. *Protos v. Volkswagen of Am., Inc.*, 797 F.2d 129, 134 (3d Cir. 1986) (evaluating Volkswagen's claim of undue hardship when asked to accommodate a worker whose religious

---

[3]In *United States v. Board of Education*, suit was filed against the Philadelphia School District Board of Education under Title VII "to advance what would more commonly be a free exercise challenge." 911 F.2d at 884. The school board, which employed a teacher who wanted to wear a headscarf, was subject to Pennsylvania's Garb Statute, 24 Pa. Stat. Ann. § 11-1112, which prohibits teachers from wearing religious clothing or symbols. *Bd. of Educ.*, 911 F.2d. at 885. We determined that to expose the school administration "to a substantial risk of criminal prosecution, fines and expulsion . . . would have been an undue hardship on it as it went about the business of running a school district." *Id.* at 891.

beliefs required her not to work on Saturdays). We need not "determine with precision the meaning of 'undue hardship' under Title VII." *Bd. of Educ.*, 911 F.2d at 890. But *Hardison* "strongly suggests that the undue hardship test is not a difficult threshold to pass." *Id.*

In *Kelley v. Johnson*, the Supreme Court characterized a police department's "[c]hoice of organization, dress, and equipment for law enforcement personnel . . . [as] a decision entitled to the same sort of presumption of legislative validity as are state choices designed to promote other aims within the cognizance of the State's police power." 425 U.S. 238, 247 (1975). Almost ten years later, in *Goldman v. Weinberger*, the Court stated that the "desirability of dress regulations in the military is decided by the appropriate military officials." 475 U.S. 503, 509 (1986). The Court also found "the traditional outfitting of personnel in standardized uniforms encourages the subordination of personal preferences and identities in favor of the overall group mission." *Id.* at 508.

Our most recent decision in this area is *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359 (3d Cir. 1999). In *Fraternal Order of Police,* we held the government cannot discriminate between conduct that is secularly motivated and similar conduct that is religiously motivated. The Newark police department forbade police officers from growing beards but granted medical exceptions for beards as required by the Americans with Disabilities Act, 42 U.S.C. § 12112. Two Muslim police officers, whose religion

9

required they grow beards, filed suit contending their First Amendment rights were infringed upon by the no-beards policy. We agreed, holding that the police department must create a religious exemption to its "no-beards" policy to parallel its secular one, unless it could make a substantial showing as to the hypothetical negative effects of a religious exemption.

In a similar case, a sister court of appeals determined "[a] police department cannot be forced to let individual officers add religious symbols to their official uniforms." *Daniels v. City of Arlington,* 246 F.3d 500, 506 (5th Cir. 2001). In *Daniels*, a police officer refused to remove a gold cross pin on his uniform, in non-compliance with a no-pins official policy. *Id.* at 501. Because the "Supreme Court has upheld appropriate restrictions on the First Amendment rights of government employees, specifically including both military and police uniform standards," the Court of Appeals for the Fifth Circuit determined the City's uniform standards were proper and the City was unable to reasonably accommodate the officer's religious needs without undue hardship. *Id.* at 503. Other courts have recognized the interests of a governmental entity in maintaining the appearance of neutrality. *See, e.g., Rodriguez v. City of Chicago*, 156 F.3d 771, 779 (7th Cir. 1998) (Posner, C.J., concurring) ("The importance of public confidence in the neutrality of its protectors is so great that a police department or a fire department . . . should be able to plead 'undue hardship' . . . ."); *Paulos v. Breier*, 507 F.2d 1383, 1386 (7th Cir. 1974) (recognizing and protecting the interest of municipality in

10

preserving nonpartisan police force and appearance thereof); *see also United States Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 565 (1973) ("[I]t is not only important that the Government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the public to be avoiding it, if confidence in the system of representative Government is not to be eroded to a disastrous extent.").

## III.

The District Court held Webb established a prima facie case of religious discrimination. We agree. Webb's religious beliefs are sincere, her employer understood the conflict between her beliefs and her employment requirements, and she was disciplined for failing to comply with a conflicting official requirement. Thus, the burden shifts and the City must establish that to reasonably accommodate Webb (that is, allow her to wear a headscarf with her uniform) would constitute an undue hardship. The City offered no accommodation, contending any accommodation would impose an undue hardship.

In the City's view, at stake is the police department's impartiality, or more precisely, the perception of its impartiality by citizens of all races and religions whom the police are charged to serve and protect. If not for the strict enforcement of Directive 78, the City contends, the essential values of impartiality, religious neutrality, uniformity, and the subordination of personal preference would be severely

11

damaged to the detriment of the proper functioning of the police department. In the words of Police Commissioner Sylvester Johnson, uniformity "encourages the subordination of personal preferences in favor of the overall policing mission" and conveys "a sense of authority and competence to other officers inside the Department, as well as to the general public."

Commissioner Johnson identified and articulated the police department's religious neutrality (or the appearance of neutrality) as vital in both dealing with the public and working together cooperatively. "In sum, in my professional judgment and experience, it is critically important to promote the image of a disciplined, identifiable and impartial police force by maintaining the Philadelphia Police Department uniform as a symbol of neutral government authority, free from expressions of personal religion, bent or bias." Commissioner Johnson's testimony was not contradicted or challenged by Webb at any stage in the proceedings.[4]

---

[4]Amici filed a Brief in Support of Reversal with a Supplemental Appendix containing articles regarding the policies and practices of other para-military organizations in the United States and the world which allow, to various degrees, religious symbols and garb as part of their uniforms. The City points out the "blatant hearsay nature" of this material and the fact it was not presented to the District Court. We do not consider material on appeal that is outside of the district court record. *In re Capital Cities/ABC, Inc.'s Application for Access*

12

Commissioner Johnson's reasoning is supported by *Kelley* and *Goldman*. As a para-military entity, the Philadelphia Police Department requires "a disciplined rank and file for efficient conduct of its affairs." *Kelley*, 425 U.S. at 242 (internal citations omitted); *see also Thomas v. Whalen*, 51 F.3d 1285, 1291 (6th Cir. 1995) ("A paramilitary law enforcement unit, such as the police, has many of the same interests as the military in regulating its employees' uniforms."). Commissioner Johnson's thorough and uncontradicted reasons for refusing accommodations are sufficient to meet the more than *de minimis* cost of an undue burden. *Hardison*, 432 U.S. at 84.

Despite Webb's assertions, *Fraternal Order of Police* is distinguishable from this case.[5] The focus of *Fraternal Order of Police* is the lack of neutrality in applying the no-beards regulation. As we explained, "the Department's decision to

_____

*to Sealed Transcripts*, 913 F.2d 89, 96 (3d Cir. 1990).

[5]In her opening appellate brief, Webb raises for the first time her contention that the "scarf policy" in Directive 78 is a secular exception akin to the medical exception in *Fraternal Order of Police*. Directive 78 allows "Scarves – black or navy blue only," in a section that also permits sweaters and earmuffs. This matter was not raised before the District Court. On review of summary judgment, we generally review only the record and arguments presented to the District Court. *Union Pac. R.R. Co.,* 293 F.3d at 126.

13

provide medical exemptions while refusing religious exemptions is sufficiently suggestive of discriminatory intent." *Fraternal Order of Police*, 170 F.3d at 365. The Philadelphia Police Department's Directive 78, by contrast, contains no exceptions, nor is there evidence the City allows other officers to deviate from it. In other ways, our decision in *Fraternal Order of Police* buttressed the District Court's opinion. We recognized that "safety is undoubtedly an interest of the greatest importance" to the police department and that uniform requirements are crucial to the safety of officers (so that the public will be able to identify officers as genuine, based on their uniform appearance), morale and esprit de corps, and public confidence in the police. *Id.* at 366.

Webb argues summary judgment was improper because there were genuine issues of material fact, pointing to her affidavit and that of police officer Rochelle Bilal. Both officers claimed other police officers displayed religious symbols, such as cross pins on their uniforms, with no disciplinary repercussions. But neither officer presented any evidence of "who" or "when," nor did either know whether the police department authorized or was even aware of the alleged occurrences. These blanket assertions with no specific evidence do not create a genuine issue of material fact. *See, e.g.*, *Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 137 (1st Cir. 2004) (finding, for these same reasons, evidence identical to the sort offered by Webb here to be "unpersuasive" in refuting employer's assertion of undue hardship and insufficient to

14

defeat summary judgment). The District Court's grant of summary judgment was proper.

IV.

Before bringing suit under Title VII in federal court, a plaintiff must first file a charge with the EEOC. *See Hicks v. ABT Assocs. Inc.*, 572 F.2d 960, 963 (3d Cir. 1978); *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398 (3d Cir. 1976). The purpose of this administrative exhaustion requirement is to put the EEOC on notice of the plaintiff's claims and afford it "the opportunity to settle disputes through conference, conciliation, and persuasion, avoiding unnecessary action in court." *Antol v. Perry*, 82 F.3d 1291, 1296 (3d Cir. 1996); *see also Hicks*, 572 F.2d at 963. While we have recognized the "preliminary requirements for a Title VII action are to be interpreted in a nontechnical fashion," the aggrieved party "is not permitted to bypass the administrative process." *Ostapowicz*, 541 F.2d at 398. Accordingly, we have held "the parameters of the civil action in the district court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Id*. at 398–99.

Webb only filed a charge of religious discrimination with the EEOC. The District Court found that her sex discrimination claim fell outside the scope of her religious discrimination claim or any investigation that reasonably would have arisen from it. Nothing in Webb's EEOC claim incorporated sex discrimination, or provided any indication to the EEOC that its

15

investigation should encompass such a claim. For these reasons, Webb's claim of sex discrimination is not sufficiently related to her religious discrimination claim to give notice or to excuse her failure to administratively exhaust it. *See Antol*, 82 F.3d at 1296. Allowing her sex discrimination claim to go forward would amount to an administrative bypass. We will affirm the grant of summary judgment with respect to the sex discrimination claim.

V.

Webb did not raise her constitutional claims until appellate review. "Generally, failure to raise an issue in the District Court results in its waiver on appeal." *Huber v. Taylor*, 469 F.3d 67, 74 (3d Cir. 2006); *see also Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below."). This general rule serves several important judicial interests, protecting litigants from unfair surprise, *see Huber*, 469 F.3d at 75 (citing *Hormel v. Helvering*, 312 U.S. 552, 556 (1941)); "promot[ing] the finality of judgments and conserv[ing] judicial resources," *Richerson v. Jones*, 572 F.2d 89, 97 (3d Cir. 1978); and preventing district courts from being "reversed on grounds that were never urged or argued" before it, *Caisson Corp. v. Ingersoll-Rand Co.*, 622 F.2d 672, 680 (3d Cir. 1980). Neither Webb's first complaint nor her amended complaint presents a constitutional claim; nor was a

16

constitutional claim raised before the District Court.[6]

We have recognized that we have "discretionary power to address issues that have been waived." *Bagot v. Ashcroft*, 398 F.3d 252, 256 (3d Cir. 2005); *see also Selected Risks Ins. Co. v. Bruno*, 718 F.2d 67, 69 (3d Cir. 1983) (noting that the decision to address a claim raised for the first time on appeal "is one of discretion rather than jurisdiction"). But we have limited our exercise of discretion to cases presenting "exceptional circumstances." *Selected Risks*, 718 F.2d at 69. In *Huber*, we indicated exceptional circumstances may exist when we are presented with "a pure question of law . . . where refusal to reach the issue would result in a miscarriage of justice or where the issue's resolution is of public importance." 469 F.3d at 74–75 (quoting *Loretangeli v. Critelli*, 853 F.2d 186, 189-90 n.5 (3d Cir. 1988)). We are not presented with a pure question of law here, nor are we faced with exceptional circumstances. We do not reach the merits of Webb's constitutional claims.

---

[6]The District Court did not address constitutional claims because none were raised. The District Court cited *Goldman* and *Kelley* in its opinion to elucidate its Title VII analysis, not to perform a separate constitutional analysis. The mere reference in the parties' briefs and the District Court's opinion to *Goldman* and *Kelley* when addressing the Title VII claim did not put the City or the court on notice that any independent constitutional claims were being raised.

17

The District Court correctly concluded the City would suffer undue hardship under Title VII if required to grant Webb's requested religious accommodation. We will affirm the judgment of the District Court.

18