NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-3710
_____

GARY MILLER,

Appellant

v.

THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-15-cv-06370)
District Judge:  Hon. Kevin McNulty

_____

Submitted Under Third Circuit L.A.R. 34.1(a)
October 2, 2019

Before: SHWARTZ, FUENTES, FISHER, *Circuit Judges*.

(Filed:  October 11, 2019)

_____

OPINION**

_____

---

** This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

FUENTES, *Circuit Judge*.

After being terminated, Gary Miller, a former utility systems maintainer for The Port Authority of New York and New Jersey (the "Port Authority"), brought suit under Title VII of the Civil Rights Act of 1964, alleging that the Port Authority failed to reasonably accommodate his religious practices of observing the Jewish Sabbath and other Jewish holidays. The District Court granted the Port Authority's motion for summary judgment, and Miller timely appealed. For the following reasons, we will affirm the judgment of the District Court.

## I. Background

Miller worked as a utility systems maintainer for the Port Authority at Newark Liberty International Airport ("EWR") from January 2, 2015 until his termination on March 21, 2015. He was staffed in EWR's Mechanical Maintenance Unit ("Unit 329"), which is responsible for, *inter alia*, the operation, maintenance, and repair of utility systems and related equipment at EWR. Unit 329 consists of fourteen utility service maintainer positions. Four utility service maintainers with the highest seniority are assigned to work Monday to Friday from 7:00 AM to 3:00 PM, and the remaining ten utility service maintainers rotate shifts as part of a neutral rotational schedule.[1] Utility service maintainers select their timeslot in the rotational schedule based on seniority. Because

---

[1] The 40-hour rotating schedule is divided by shifts. The "A" shift requires seven consecutive days of work from 11:00 PM to 7:00 AM, followed by two regular days off. The "B" shift requires six consecutive days of work from 7:00 AM to 3:00 PM, followed by three days off. The "C" shift requires seven consecutive days of work from 3:00 PM to 11:00 PM, followed by two days off.

Miller had the lowest seniority of any utility service maintainer in Unit 329, he was assigned to the only vacant position, which required him to work Friday evenings and Saturdays.

At all relevant times, utility service maintainers in Unit 329 were members of the International Union of Operating Engineers, Local 68 (the "Union"), and subject to a collective bargaining agreement between the Port Authority and the Union (the "Memorandum of Agreement"). The Memorandum of Agreement dictated terms and conditions of Miller's employment, including, but not limited to, the use of personal excused days, use of vacation days, and changes to work schedules. The Port Authority was not allowed to unilaterally make changes to existing works schedules under the Memorandum of Agreement.

On January 5, 2015, Miller, as an observant of the Jewish faith, spoke with Albert Kosakowski, Chief Maintenance Supervisor at EWR, and requested a religious accommodation so that he not be required to work on the Jewish Sabbath, which begins at sunset on Friday and ends at sunset on Saturday, or on Jewish holidays.[2] Miller's preferred accommodation meant he would not work B or C shifts on Fridays and no shifts on Saturdays. Upon being informed of Miller's requested accommodation, Sarah McKeon, the Manager of Airport Maintenance at EWR, consulted with Kosakowski, Maintenance Unit Supervisor William Lynch, the Port Authority's Office of Equal Employment

---

[2] Miller specifically requested that he be allowed to leave work at least four hours before sunset on Fridays, and that he be allowed not to commence work any sooner than two hours after sunset on Saturdays. Not all holidays required that Miller miss a shift at work.

3

Opportunity, the Human Resources Department, and the Law Department. McKeon denied Miller's preferred accommodation because of the "critical functions of a [utility service maintainer] and the requirement to have continuous coverage at EWR," the constraints imposed by the Memorandum of Agreement, potential overtime costs, and the effect on employee morale if other utility service maintainers were required to work additional weekend shifts.[3] Thereafter, McKeon met with Miller and informed him that he had the option of swapping shifts with other employees and using vacation days, personal excused time, or compensatory time to observe religious holidays.[4]

Miller subsequently used personal excused time for religious purposes from January 2015 to late February 2015. On February 28, 2015, Miller attempted to use excused time off to observe the Sabbath; however, the request was denied because, at the time, Miller did not have enough excused time to cover his request. Miller did not attempt to use his vacation time for this request. Nor is there clear evidence that Miller attempted to swap shifts with another utility service maintainer in Unit 329. On February 28, 2015, Miller did not appear for work and was marked absent without leave. Miller's unexcused absence required the Port Authority to pay overtime to another utility service maintainer to cover Miller's shift.

---

[3] A. 140. While Miller contends that the Port Authority denied his request for an accommodation on the same date he began his employment, the evidence only shows that the Port Authority denied Miller's preferred accommodation, not that it denied Miller any accommodation.

[4] Miller was also informed that the Port Authority would allow him to initiate more than two mutual tour swaps, despite this being a variance from the Memorandum of Agreement.

4

Miller subsequently requested time off on four occasions in March 2015 for religious reasons, and the Port Authority denied those requests because it required coverage for those four shifts, Miller did not have additional personal days or compensatory time to cover the shifts, and unpaid leave, as Miller requested, was not a permitted or recognized form of leave. Miller did not attempt to use vacation days or utilize the option of mutual swaps to cover these shifts.[5] Despite the Port Authority denying his requests for leave, Miller failed to appear for work and the Port Authority marked him as absent without leave. In view of his unexcused absences, the Port Authority terminated Miller's employment on March 21, 2015.

Miller then filed suit, alleging that the Port Authority did not provide a reasonable accommodation for his religious observances. The District Court granted summary judgment for the Port Authority.[6] The District Court concluded that the Port Authority offered Miller a reasonable accommodation and that, in the alternative, Miller's preferred accommodation would have imposed an undue hardship on the Port Authority.[7] This appeal followed.

---

[5] Miller testified during his deposition that he could not recall whether he attempted to initiate mutual tour swaps. However, he also testified that, although he could not recall their names, he spoke with other utility service maintainers but did not "find anyone to swap with." A. 402–03. In Miller's declaration, he stated that he made good faith efforts to swap shifts with other utility service maintainers. Miller did not provide any further details concerning his purported attempts to initiate mutual swaps with other utility service maintainers.

[6] *Miller v. Port Auth. of N.Y. & N.J.*, 351 F. Supp. 3d 762 (D.N.J. 2018).

[7] *Id.* at 788–91.

## II. Standard of Review[8]

We review the District Court's grant of summary judgment *de novo*, making all reasonable inferences in favor of the nonmoving party.[9]  Summary judgment is appropriate only if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law,[10] and we may affirm the grant of summary judgment on any basis supported by the record.[11]

## III.  Discussion

To establish a *prima facie* case of religious discrimination under Title VII, an "employee must show: (1) she holds a sincere religious belief that conflicts with a job requirement; (2) she informed her employer of the conflict; and (3) she was disciplined for failing to comply with the conflicting requirement."[12]  Once the employee satisfies these elements, the burden "shifts to the employer to show either it made a good-faith effort to reasonably accommodate the religious belief, or such an accommodation would work an undue hardship upon the employer and its business."[13]

The parties do not dispute that Miller established a *prima facie* case of religious discrimination based on a failure to accommodate.  Instead, the parties dispute whether the

---

[8] The District Court had federal question jurisdiction over Miller's Title VII claim under 28 U.S.C. § 1331.  We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.
[9] *Montone v. City of Jersey City*, 709 F.3d 181, 189 (3d Cir. 2013).
[10] Fed. R. Civ. P. 56(a).
[11] *See Murray v. Bledsoe*, 650 F.3d 246, 247 (3d Cir. 2011) (per curiam).
[12] *Webb v. City of Philadelphia*, 562 F.3d 256, 259 (3d Cir. 2009) (citation omitted).
[13] *Id.*

Port Authority satisfied its burden of showing either that it offered Miller a reasonable accommodation, or that doing so would impose an undue hardship.

Miller argues that the Port Authority did not offer any accommodation because he was not told that he could use vacation time, the Port Authority made no effort to facilitate voluntary mutual swaps with other utility service maintainers, and the Port Authority failed to engage in an "interactive process" with Miller. We disagree.

Although "Title VII does not define what is a 'reasonable accommodation,'" the Supreme Court has "made clear" that "a sufficient religious accommodation need not be the 'most' reasonable one (in the employee's view), it need not be the one that the employee suggests or prefers, and it need not be the one that least burdens the employee."[14] Simply put, when the employer offers any reasonable accommodation, the statutory inquiry is at an end.[15]

First, the Port Authority made a good-faith effort to reasonably accommodate Miller's religious practices by allowing him to use paid time off—including vacation, personal excused, and compensatory time—and to utilize voluntary mutual swaps with other utility service maintainers without restrictions.[16] While Miller argues that he was not

_____

[14] *Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 225 (3d Cir. 2000) (citing *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68–69 (1986)).
[15] *See id.*
[16] While Miller challenges these accommodations in isolation, we need not decide whether each accommodation was reasonable in isolation because they were all offered as part of the Port Authority's attempt to accommodate Miller's religious practices. *See Sanchez-Rodriguez v. AT&T Mobility P.R., Inc.*, 673 F.3d 1, 12–13 (1st Cir. 2012) (declining to consider the accommodations in isolation and concluding that the employer's combined accommodations, including allowing the employee to swap shifts with his co-workers, constituted a reasonable accommodation of the employee's religious beliefs); *Getz v.*

7

told he could use vacation time, the Port Authority submitted evidence showing that he was entitled to, and allowed to, take ten days of vacation time. Indeed, under the collective bargaining agreement, new utility service maintainers are entitled to ten vacation days, which they can start using any time after starting their employment. Miller's paychecks similarly reflected his accrued vacation time. Further, Miller's claim that it would have been "absurd" for him to have refused to take vacation time,[17] especially when his requests for time off were denied in March 2015, is unconvincing and insufficient to rebut the Port Authority's documentary evidence showing that Miller was entitled to use vacation time. Indeed, Miller testified that he did not recall how many vacation days he had, not that he was under the impression that he did not have vacation days available. Miller also testified that it was he who designated the type of time off requested, yet the Port Authority's undisputed business records show that he never opted to use vacation time to accommodate

---

*Pennsylvania*, 802 F.2d 72, 73–74 (3d Cir. 1986) (concluding that the employer provided a reasonable accommodation by allowing the employee to take religious holidays with pay as per the collective bargaining agreement but refusing to allow the employee to work overtime in order to accumulate additional vacation leave); *see also Tabura v. Kellogg USA*, 880 F.3d 544, 555 (10th Cir. 2018) ("[The employer] sought to accommodate Plaintiffs' Sabbath observance through a combination of allowing them to use their vacation and other paid time off, as well as permitting Plaintiffs to swap shifts with other employees. Such a combination might, under the facts of a particular case, reasonably accommodate an employee's Sabbath observance."); *EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 315 (4th Cir. 2008) ("Through various mechanisms, each significant in their own right, [the employer] sought to assist [the employee] . . . . These accommodations plainly satisfied Title VII."); *Thomas v. Nat'l Ass'n of Letter Carriers*, 225 F.3d 1149, 1156 (10th Cir. 2000) (holding employer offered reasonable accommodation where it approved use of leave on the employee's day of Sabbath, permitted use of substitutes when possible, sought a waiver from the union of the requirement that the employee work five out of six days a week, and recommended the employee bid for other positions that would not require work on Sabbath).

[17] Appellant's Br. at 15 (citing A. 1264).

8

his religious observances. Simply put, Miller has not provided evidence to rebut the assertion that he was entitled to use vacation time but failed to do so.

Second, Miller argues that the Port Authority's voluntary swap policy is not a reasonable accommodation because the Port Authority did not make any efforts to facilitate swaps. The record belies Miller's claims. Kosakowski made a public announcement to other utility service maintainers that Miller would be looking for voluntary, mutual swaps and encouraged them to consider his request. Further, the Port Authority informed Miller that the schedule of all utility service maintainers would be made available to him and that a list of all Unit 329 staff with their personal telephone numbers could be found in the "Watch Engineers Office" at EWR.[18] Miller's dissatisfaction with the Port Authority's efforts to facilitate mutual swaps does not create a genuine dispute as to whether the accommodation was reasonable.[19]

---

[18] A. 147.

[19] Miller's argument that the Port Authority failed to engage in an "interactive process" with him before rejecting his preferred request for an accommodation is meritless. While we have previously held that the Americans with Disabilities Act imposes a duty on both an employer and employee "to assist in the search for appropriate reasonable accommodation and to act in good faith," *Deane v. Pocono Medical Center*, 142 F.3d 138, 149 (3d Cir. 1998) (en banc) (quoting *Mengine v. Runyon*, 114 F.3d 415, 420 (3d Cir. 1997)), we have not yet imposed a similar duty on employers for Title VII religious accommodation claims. However, even assuming a similar duty exists under Title VII, we agree with the District Court that the Port Authority engaged in good faith efforts by "carefully consider[ing] the relevant factors" in arriving at a reasonable accommodation. *Miller*, 351 F. Supp. 3d at 787. While Miller points to purported inconsistencies between McKeon's deposition testimony and her certification as to the efforts she undertook, he does not present evidence to rebut the Port Authority's factual assertions that McKeon reviewed the schedules of other utility service maintainers, considered whether it was feasible to redo the schedule to avoid Miller working Fridays and Saturdays, considered the constraints of the collective bargaining agreement, reviewed past practices of Unit 329,

Therefore, we agree with the District Court that the Port Authority met its burden of showing that it reasonably accommodated Miller's religious practices and that Miller failed to proffer evidence sufficient to raise a genuine issue of material fact.[20]  As a result, the Port Authority is entitled to summary judgment.

## IV.  Conclusion

For the foregoing reasons, we will affirm the District Court's grant of summary judgment to the Port Authority.

---

and considered the impact on employee morale if certain employees were required to work weekends in order to accommodate Miller.

[20] Because we find that the Port Authority offered Miller a reasonable accommodation, we need not reach the question of whether Miller's preferred accommodation would have imposed an undue hardship.  Notwithstanding, for the reasons substantially stated in the District Court's thorough and well-reasoned opinion, we would also affirm on this basis.