# United States Court of Appeals
## For the Eighth Circuit

_____

No. 24-1098

_____

Dean Naylor

*Plaintiff - Appellant*

v.

County of Muscatine, Iowa; John Does 1-50

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Southern District of Iowa - Eastern

_____

Submitted: January 14, 2025
Filed: August 19, 2025
[Published]

_____

Before LOKEN, ARNOLD, and KELLY, Circuit Judges.

_____

PER CURIAM.

Dean Naylor brought this action under Title VII, asserting that his former employer, Muscatine County, terminated him because of his religion. After the district court granted summary judgment to Muscatine County, Naylor appealed. We reverse and remand.

I.

From May 2010 until May 2020, when he was fired, Naylor worked as the jail administrator for the Muscatine County Sheriff's Office. In that capacity, he monitored the safety of the people detained at the jail, supervised staff, and compiled the jail's budget.

In early April 2020, a reporter emailed the Muscatine County Sheriff C.J. Ryan to ask whether he was aware of a "lengthy treatise" Naylor posted online and several YouTube videos Naylor posted to a public channel. The "treatise" the reporter was referencing was a public Google document Naylor posted in November 2013 titled "The Church and the End Time." In the document, Naylor discussed his post-tribulation Rapture beliefs, including his predictions for an impending world war that he asserted the Muslim people would perpetrate against Christian and Jewish people. Soon after emailing Ryan, the reporter published an article in an Iowa newspaper about Naylor's online commentary, titled "Iowa jail official: Muslims are 'pawns of the devil' aiming to kill Christians," which quoted Naylor's online commentary at length.[1] In response to the article, a community member, the Mayor of Iowa City, and the Johnson County, Iowa, Board of Supervisors expressed concern about the civil liberties of the people detained in the jail. The Johnson County Sheriff and a representative of the United States Marshals Service (USMS)

---

[1]In relevant part, the article quoted the following language from Naylor's Google document and videos: (1) "people following the Muslim faith are nothing more than pawns to the devil"; (2) "Muslims . . . are being influenced now to kill and eradicate all Christians and Jews"; (3) "[t]he next thing on the horizon is a world war. This war will kill a third of mankind"; (4) "the gay lifestyle . . . is an abomination that according to scripture even defiles the land [and] has caused great harm on our nation"; and (5) "[w]e need to start preparing for war—spiritual war and physical war."

also had phone calls with Ryan about whether they would "continue to house [overflow] inmates with the [Jail]."[2]

Muscatine County put Naylor on administrative leave and, on May 1, 2020, fired him. The termination letter provided two reasons: first, Naylor's "continued employment [wa]s contrary to good order and discipline at the jail," and second, he "lack[ed] credibility to function effectively in a management role."

Naylor filed suit, alleging Muscatine County violated Title VII[3] by firing him because of his religious postings on the internet. The district court granted summary judgment to Muscatine County. Naylor appeals.

II.

"We review the district court's grant of summary judgment de novo, 'viewing the facts and inferences . . . in the light most favorable to the nonmoving party.'" Said v. Mayo Clinic, 44 F.4th 1142, 1147 (8th Cir. 2022) (alteration in original) (quoting Walsh v. Alpha & Omega USA, Inc., 39 F.4th 1078, 1082 (8th Cir. 2022)). Summary judgment is appropriate "only when the record shows 'no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Id. (quoting Fed. R. Civ. P. 56(a)). "The movant has the burden of showing that there is no genuine issue of fact . . . ." Hodge ex rel. Farrow v. Walgreen Co., 37 F.4th 461, 464 (8th Cir. 2022) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).

---

[2]Muscatine County has agreements with various entities including USMS and Johnson County to house their overflow detainees in its jail as needed. By providing space for these outside entities, Muscatine County generates revenue.

[3]Naylor initially raised additional claims, but he seeks appellate review of only the Title VII claim against Muscatine County.

Title VII "forbids employers to: (1) [discharge] an [employee] (2) 'because of' (3) 'such individual's . . . religion.'" EEOC v. Abercrombie & Fitch Stores, Inc., 575 U.S. 768, 772 (2015) (fourth alteration in original) (quoting 42 U.S.C. § 2000e-2(a)(1)). "The word 'religion' is defined to 'includ[e] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to' a 'religious observance or practice without undue hardship on the conduct of the employer's business.'" Id. at 771–72 (alteration in original) (quoting 42 U.S.C. § 2000e(j)). Here, the district court considered only whether Muscatine County could reasonably accommodate "Naylor's online commentary absent undue hardship," and held that it could not. As such, we too reach only the undue hardship issue.[4]

To establish undue hardship, "an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." Groff v. DeJoy, 600 U.S. 447, 470 (2023) (abrogating case law requiring only a showing of "more than a *de minimis* cost"). In Groff, the Supreme Court explained that assessing whether a proposed accommodation would cause undue hardship to the employer is a "fact-specific inquiry," id. at 468, and "courts must apply the test in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, 'size and operating cost of [an] employer,'" id. at 470–71 (alteration in original) (quotation omitted). The hardship must typically impose a greater burden than that created "by temporary costs, voluntary shift swapping, occasional shift swapping, or

_____

[4]Both parties treat Naylor's claim as one involving a failure to accommodate. But see Carter v. Loc. 556 Transp. Workers Union of Am., 138 F.4th 164, 185 (5th Cir. 2025) (explaining that Title VII's "definition of 'religion' excludes any 'religious observance or practice' an employer is 'unable to reasonably accommodate' 'without undue hardship'" and that "[a]s a result, reasonable accommodation and undue hardship are only relevant for claims based on observance or practice" (quoting 42 U.S.C. § 2000e(j))). For purposes of this appeal, we approach the case as the parties present it to us.

administrative costs," id. at 471, and we have separately held that any such hardship must be sufficiently "real rather than speculative, merely conceivable, or hypothetical," Brown v. Polk County, 61 F.3d 650, 655 (8th Cir. 1995) (quotations omitted).

At the district court, Muscatine County argued it would suffer two types[5] of undue hardship if it continued to employ Naylor as jail administrator.[6] First, the County argued that keeping Naylor on would cause the jail undue hardship because the publicity surrounding his online commentary—which included disparaging views of Muslims and "the gay lifestyle"—had harmed its public image. Specifically, the County asserted that Naylor's online postings had spurred public concern that the County was discriminating against members of these communities who were detained at or visiting the Jail. Citing Webb v. City of Philadelphia, the district court agreed with the County, explaining that "[j]ails, like police

_____

[5]In its motion for summary judgment, Muscatine County raised other possible ways in which keeping Naylor employed constituted an undue hardship, but the district court considered only two. For example, the district court did not consider evidence of discriminatory treatment of people at the jail based on their membership in the Muslim or gay communities, or the risk of an increased number of lawsuits due to allegations of discrimination. See Groff, 600 U.S. at 468; see also EEOC Compliance Manual § 12-IV(C)(6) (Jan. 15, 2021) (explaining that "religious expression . . . might constitute unlawful harassment . . . where it is facially abusive (i.e., demeans people of other religions)" or "where the expression could be mistaken as the employer's message, particularly in the instance of government employers"); Russo v. Patchogue-Medford Sch. Dist., 129 F.4th 182, 186 (2d Cir. 2025) ("Under our precedent, an accommodation that would require an employer to violate the law imposes an undue hardship."). We consider only the types of undue hardship that the district court addressed.

[6]There is no evidence Naylor requested, or Muscatine County considered, any accommodation, but both parties on appeal represent that the "accommodation" at issue was to maintain the status quo—i.e., for Naylor to keep his postings available to the public and remain employed as jail administrator. For purposes of appeal, we adopt this framing.

departments, have an interest 'in maintaining the appearance of neutrality.'" See 562 F.3d 256, 261 (3d Cir. 2009) (holding, pre-Groff, that allowing a police officer to wear a hijab on duty would cause undue hardship by threatening the appearance that the police department was religiously neutral).

We assume, but need not decide, that public image effects can present issues for an organization sufficient to rise to the level of an undue hardship under Title VII.[7] Here, the County has simply not provided sufficient evidence to warrant summary judgment on this ground. While there is some evidence of public concern about Naylor's inflammatory comments about Muslims and the gay community, and some evidence that Naylor's behavior was publicized in a way that could lead to reputational harm to the jail, the record nonetheless lacks sufficient evidence of an actual negative impact on the jail's public image. As we see the record, the only concern voiced by the public came from a single community member's email; other disapproval came from public officials or in news articles, whose reach or impact is unknown. Absent more definitive evidence of reputational harm, and with an unclearly articulated theory of how such harm would constitute a hardship, the

---

[7]We can imagine at least some ways in which an effect on public image might pose an undue hardship for an employer. For private employers, publicity problems could threaten stock prices. And for state entities like a county jail, certain public-facing religious displays by employees may inflect the employer's public image with religion in a way that would pose establishment-clause problems. See, e.g., Berry v. Dep't of Soc. Servs., 447 F.3d 642, 655 (9th Cir. 2006) (holding that permitting an employee "to discuss religion with . . . clients" or display religious decorations in front of clients would "require the Department to accept, or have to rebut, the inherent suggestion of Department sponsorship," such that both would "constitute[] an undue hardship" because of the "danger of violations of the Establishment Clause"); see also Russo, 129 F.4th at 186 (employers are not required to make accommodations that would violate the law). And where harm to a public image causes separate concrete costs—protests in a parking lot, flooded inboxes or voicemail machines, and the like—a business or entity might conceivably face undue hardships. Of course, as the Supreme Court stated in Groff, hardship based on "animosity to a particular religion, to religion in general, or to the very notion of accommodating religious practice cannot be considered 'undue.'" 600 U.S. at 472.

County's evidence does not warrant summary judgment. See generally, Hebrew v. Tex. Dep't of Crim. Just., 80 F.4th 717, 722 (5th Cir. 2023) (reversing a district court's undue hardship finding because, in part, defendant "nowhere identifies any actual costs it will face" from granting the plaintiff's requested accommodation); see also Said, 44 F.4th at 1147 (noting we must view the record in the nonmovant's favor). Similarly, the County has not offered enough evidence of other types of hardship stemming from public-image harm, in the form of protest or otherwise, that would threaten the jail's ability to function. See Brown, 61 F.3d at 655 ("An employer 'stands on weak ground when advancing hypothetical hardships in a factual vacuum.'" (quotation omitted)). While a jury might conclude that the jail faced an undue hardship in these circumstances—i.e., that keeping Naylor on would have harmed the jail's public image in a way that caused it undue hardship—viewing the record in Naylor's favor, we cannot say that at this stage the County has established it as a matter of law.

As a second, related type of undue hardship, Muscatine County argued to the district court that retaining Naylor as the jail administrator would imperil its business relationships. The district court agreed, relying on evidence that two outside entities—USMS and Johnson County—considered ending their agreements to send their overflow detainees to the jail as a result of Naylor's online commentary, and that the loss of these relationships would cause a significant financial burden to Muscatine County. While a reasonable jury could find this evidence sufficient to establish an undue hardship, the evidence is insufficient to support the grant of summary judgment.

We acknowledge that the County presented some evidence that contracts were threatened: in addition to the concern from public officials discussed above, officials from both USMS and the Johnson County Sheriff's Office independently suggested they might cancel their overflow contracts with the jail due to Naylor's inflammatory comments. Naylor himself testified that USMS and Johnson County were the jail's biggest clients and that the jail could lose millions of dollars from the loss of its overflow contracts.

But this evidence is insufficient to show as a matter of law that the County's business relationships were so imperiled that keeping Naylor employed would cause the County undue hardship. For one, any loss of contractual relationships appears speculative from the evidence the County presented, with Ryan having conversations about *whether* USMS would terminate its contract, and Johnson County warning only that it "may" have to do the same. Viewing the record in Naylor's favor, this evidence does not betray a sufficiently "real" chance that either entity would have canceled its contract with the jail to find an undue hardship at summary judgment. See Brown, 61 F.3d at 653. Nor can we say that sufficient record evidence showed that the loss of either or both of these contracts would pose a hardship "substantial . . . in relation to the conduct of [the jail's] particular business." See Groff, 600 U.S. at 470. Naylor's testimony about the amount of money it would cost the Jail to lose the contracts was inexact; he made his estimation years after he had last worked on the jail's budget and did not limit his testimony to either or both entities' overflow contracts.[8] For example, there is evidence that only four overflow detainees from Johnson County were housed among the jail's 255-person capacity in April 2020. We cannot say that the County's evidence eliminated any factual dispute about whether the potential loss of either or both business relationships would "practical[ly] impact . . . the nature, 'size and operating cost of'" the jail. See id. at 470–71 (quotation omitted).

On this record, there remain genuine issues of material fact as to whether Naylor's continued employment would pose an undue hardship to the County. See id. at 468 (determining whether a burden amounts to "undue hardship" is a "fact-specific inquiry"). We reverse and remand for further proceedings, as appropriate.

_____

---

[8]Naylor estimated that the jail's contracts with "the feds" were worth millions of dollars. But USMS is not the only federal entity with which the jail contracts: Muscatine County also has agreements with Immigration and Customs Enforcement (ICE) and the Bureau of Prisons (BOP) to house those entities' overflow detainees.